**UNITED STATES of America ex rel. Francis Henry BLOETH, Relator-Appellant,**

**v.**

**Wilfred DENNO, as Warden of Sing Sing State Prison, Ossining, New York, Respondent-Appellee.**

No. 387, Docket 27584.

United States Court of Appeals Second Circuit.

Argued June 15, 1962 to a Panel.

Submitted to the In Banc Court Dec. 5, 1962.

Decided Jan. 25, 1963.

Certiorari Denied April 22, 1963.

See 83 S.Ct. 1112.

Leon B. Polsky, Legal Aid Society, New York City (Anthony F. Marra, New York City, on the brief), for relator-appellant.

Irving L. Rollins, Asst. Atty. Gen. of the State of New York (Louis J. Lefko-witz, Atty. Gen., and Samuel A. Hirsho-witz, First Asst. Atty. Gen., on the brief), and Charles T. Matthews, Asst. Dist. Atty. of Suffolk County, N. Y. (Bernard C. Smith, Dist. Atty. of Suffolk County, on the brief), for respondent-appellee.

Before LUMBARD, Chief Judge, and CLARK, WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and MARSHALL, Circuit Judges.

SMITH, Circuit Judge, with whom CLARK, WATERMAN, KAUFMAN, HAYS and MARSHALL, Circuit Judges, concur.

Appellant, convicted of murder in the first degree in the County Court for the County of Suffolk, New York, and sentenced on May 18, 1960 to be executed, judgment affirmed by the New York Court of Appeals March 2, 1961, People v. Bloeth, 9 N.Y.2d 211, 213 N.Y.S.2d 51, 173 N.E.2d 782, remittitur amended 9 N.Y.2d 823, 215 N.Y.S.2d 769, 175 N.E. 2d 347, certiorari denied October 9, 1961, 368 U.S. 868, 82 S.Ct. 98, 7 L.Ed.2d 65, petitioned in the United States District Court for the Southern District of New York for a writ of habeas corpus. Show cause order was granted, but the petition was withdrawn without prejudice January 9, 1962 in order to move for reargument in the New York Court of Appeals. Reargument was denied, People v. Bloeth, 11 N.Y.2d 768, 227 N.Y.S.2d 18, 181 N.E. 2d 763, February 22, 1962. Applications for stay pending petition for writ of certiorari were denied by Judge Fuld March 7, 1962 and by Mr. Justice Harlan March 19, 1962, Bloeth v. State of New York, 82 S.Ct. 661, 7 L.Ed.2d 780. Application to the District Court for the Southern District of New York for writ of habeas corpus was denied April 3, 1962. Leave to reargue and to amend the petition were granted and on reargument the petition for writ of habeas corpus was denied May 9, 1962. From the orders of April 3 and May 9 by Cashin, D. J., relator appeals, claiming that he was entitled to a hearing on his claims that his con-

fession was involuntary and procured in violation of his right to be represented by competent counsel devoted solely to the interests of his client, and upon the ground that upon the state court record it appears that relator was denied a trial by a fair and impartial jury in violation of his rights under the Fourteenth Amendment. The panel which heard the original arguments on the appeal, Chief Judge Lumbard, Judge Marshall and the writer, considered that the importance of the case as a guide for the District Courts in the discharge of their high responsibilities in the habeas corpus jurisdiction and particularly in the application of the principles recently set down in Irvin v. Dowd, 1961, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, to the facts of cases such as this, make it appropriate for in banc consideration. A majority of the full Court finds this case within those principles and directs the writ to issue.

Between July 31, 1959 and August 8, 1959, there occurred three nighttime murders of lone attendants at small business establishments in Suffolk County, New York. In each instance it appeared that robbery was perpetrated and the victim killed in cold blood by .32 caliber pistol shot to prevent identification of the robber. After the third killing, a witness came forward to tell of the sale of a .32 pistol to appellant prior to the third shooting, and apparently also of statements by appellant admitting the earlier two.

Bloeth was picked up and questioned, denying implication in the murders. Holsters identified as sold him with the pistols referred to were found at Bloeth's residence. He was allowed to see counsel, from the firm of one Siben, in whose office Bloeth's sister was employed. After four days of intermittent questioning, and instruction from Siben that he need not make any statement, but advice from Siben and Bloeth's mother and wife that he should tell the truth and cooperate with the police, Bloeth confessed the Currier murder, for which he was tried, the other two robbery murders, a rape, an assault with a claw-hammer on an elderly woman, and at least one other armed robbery. Bloeth pointed out to the police where he had disposed of the gun used in the Currier murder. The gun was located and its identity later confirmed by ballistic tests. Prior to the confession Siben informed the District Attorney that Bloeth was in his opinion insane and that he would confess. Siben did not remain with Bloeth to hear the confession to the authorities.

The communities in Suffolk County, small towns and cities in transition from semi rural to industrial and suburban residential areas, had been thoroughly alarmed at the murders and the presence of a "mad killer" in their midst. The press gave front page space and scare headlines to the killings, the search for the killer, and the fears of the people. The press received and widely published news of Bloeth's confession from the District Attorney's office, from the police, from Siben, and from Bloeth's wife, of the contemplated defense of insanity from Siben and from the District Attorney of the District Attorney's belief that Bloeth was sane and must get the chair.[1] Prior to the confession, while Bloeth was being held for questioning,

---

[1]. The inflammatory and prejudicial nature of the newspaper commentary can only be indicated from the following sample of headlines and articles:

"'Mad Killer' Confesses" (Newsday, August 14)

"Bloeth: From Bad Boy to 'Mad Killer'" (Newsday, August 15)

"Bloeth Must Go To Chair: DA" (Newsday, August 18)

"Bloeth is Insane, His Lawyer Claims —Hopes to Save Killer from Chair" (Long Island Press, August 15)

"'If I Get Chair, That's It': Bloeth" (Newsday, August 18)

"'Joker in Law: Bloeth Could Go Free Again" (Newsday, August 18)

"Mental Hospital 'Rejects' Bloeth; Killer to Get Sanity Test in Jail" (Long Island Press, September 8)

"As it happens with most major criminals, the wife and neighbors of Francis

the District Attorney was quoted in the press as stating that the method of the stickup was "characteristic of the sadistic nature of Bloeth". The press reported that Bloeth "flunked" lie detector tests given by the police in New York City. After the confession, records from Woodbourne Prison were released through the press, describing Bloeth as "hostile, sadistic" with a "deep hatred of discipline" and an admitted narcotic user.

One Newsday article carried the headline " 'Joker' in law, Bloeth could go free again", with comment on the New York "archaic sanity law" pointing out a claimed possibility of a jury verdict of acquittal on the grounds of temporary insanity—"Result: The defendant would be free—perhaps to kill again." The newspapers, particularly Newsday and other local papers, as well as New York papers and radio and T.V. news programs, gave extensive coverage to these statements. Newsday, a daily, had a circulation of 100,000, the Long Island Daily Press 35,000 in the county with a population of about 600,000.

When the case was assigned for trial, under New York practice motion was made in the Appellate Division for change of venue by Clarke, formerly of Siben's office, who had taken over the defense. The results of a survey purporting to show widespread knowledge of the case from the publicity, the formation of opinions of guilt and an opinion by a majority of those questioned that a fair trial was impossible in Suffolk County, were submitted to the Court.[2] The Court however, was apparently of the opinion that a fair trial could be had without change of venue and denied the motion.

Of the 16 jurors seated in the case as regular and alternate jurors, only one had not read of the case. Of the 16, eight stated that they had formed no opinion of guilt or innocence, the other

---

Henry Bloeth pictured him yesterday as a quiet family man. But to police, he is a violent, sadistic ex-con who is a likely suspect in the 'mad killer' murders." (Newsday, August 12)

"Francis Henry Bloeth, who murdered three humans with as little emotion as other persons feel while swatting mosquitos, could walk out of court a free man in the not-too-distant future because of New York's archaic sanity law * * * Result: The defendant would be free— perhaps to kill again * * * Experts admit that the present law leaves loopholes through which dangerous criminals can escape. But they are quick to say that no one has come up with acceptable substitute proposals * * *" (Newsday, August 18)

"As far as I am concerned;" said Cohalan, [the District Attorney for Suffolk County] "Bloeth is legally sane and will stand trial for the three murders. He knew what he was doing and that it was wrong to do it." (Long Island Press, August 16)

2. The affidavit of one Boskin, submitted to the Appellate Division, contained the following:
"That he is over the age of 21 and resides at 51 Marvin Lane, Islip, New York.

That between the dates of February 8, 1960 and February 19, 1960, he was employed by the firm of Clarke & Sider for the purpose of taking a public opinion poll in order to ascertain the status of the opinion of the people residing in Suffolk County towards Francis Henry Bloeth, presently under indictment for murder.

A sample of two hundred and ten residents whose answers to the following questions are annexed hereto and made part of this affidavit are set forth:

1—To the question "Have you ever heard of Francis Henry Bloeth who is accused of murdering three people in Suffolk County?", all two hundred and ten indicated that they were familiar with the subject.

2—To the question "Do you think he is guilty", two hundred and three answered "Yes", one "Not sure", three are of no opinion and three say "Insane".

3—To the question, "Do you know that he has already confessed?", ten said "No" and two hundred answered "Yes".

4—To the question, "Do you think he would receive a fair trial in Suffolk County?", one hundred and thirty-three answered "No", seventy six said "Yes" and one had no opinion."

eight stated that they had formed an opinion of guilt, but expressed themselves in various terms as being able to change the opinion or to render an impartial verdict.[3] Of 80 other jurors drawn, 42 were excused on various grounds without interrogation as to knowledge of the case from the publicity. Of the remaining 38, 36 had read about the case, 2 had not, 31 stated that

3. In brief summary, the testimony on voir dire of the jurors eventually selected was as follows:

| | |
|---|---|
| #1—Bassarear | Read Newsday (not every day), Time Magazine, Radio—*opinion as to guilt or innocence*, still held. Opinion could be changed (by testimony)—could render an impartial verdict. Maybe a little prejudice on hearing or reading of the crime. |
| #2—Bellizzi | Read very little—Long Island Press—*Opinion as to guilt or innocence*—towards guilt. Subject to change (by testimony)—victim of burglary—strong resentment. |
| #3—Obert | Doesn't recall reading about it—away two weeks in August. *No opinions.* |
| #4—Usher | Subscribe to Newsday—Read headlines—never read the story. *No opinion.* Bookkeeper—works for beer distributor. Victim's brother a customer. Knew Officer Gaiser. |
| #5—Schuman | Read Daily News, Mirror, Newsday and weekly—*opinion of guilt or innocence. Prejudice against Defendant* until I hear further evidence. I think I can (dismiss from mind such feeling). Believe can render impartial verdict because of evidence alone. *Opinion, not prejudice.* |
| #6—Uhl | Only headlines—Daily News—*no opinion* or impression. |
| #7—Larsen | Read some—Newsday subscriber. Away most of August. *No opinion.* |
| #8—King | Read in Newsday—Subscribes—Television—*No opinion.* |
| #9—Rockwell | Times, Tribune, World-Telegram—few articles. *No opinion.* |
| #10—Adams | New York Daily News and Radio—Discussed casually. *Expressed opinion I was thankful* after apprehension of Defendant. |
| #11—Dowd | Newsday, subscribe. Discussed. *Formed opinion as to guilt or innocence towards Defendant's guilt—still have it.* Would not influence verdict. Read statements or quotations from District Attorney Cohalan. |
| #12—Oliver | Herald Tribune—discussed, *opinion as to guilt or innocence towards guilt*—still have it. Don't think it would influence verdict. Could eradicate. Auxiliary policeman. |
| Alt. #1—Foster | Newsday—subscribes—*formed opinion of guilt.* Could set it aside. |
| Alt. #2—Parizman | Newsday and other publications—Discussed. *No opinion.* |
| Alt. #3—Lomonosoff Took place of juror #11. | Read about it—of course I did—Newsday—subscribes. Discussed. *No opinion.* |
| Alt. #4—Stopes | Read of it of course—probably Newsday and one of New York papers. Discussed with wife. *Opinion*—Don't now have "firm opinion". Don't believe it would influence verdict. |

they had formed an opinion of guilt or innocence, 5 stated they had formed no opinion. In every case where the talesmen were asked to specify which way the opinion went, it was toward Bloeth's guilt.[4]

4. Summary of examination of Prospective Jurors not seated:

| | |
|---|---|
| Wisnoski | Had done business with District Attorney and Asst. District Attorney. Excused by consent. |
| Ueckerman | Read of case in local daily papers—held an opinion which would influence verdict—challenged by Defendant for cause. |
| Lynch | Read of case in daily paper, Newsday—heard of it on radio—no opinion. Represented by Siben in negligence case—Peremptory by People. |
| Kemp | Read of case in Newsday and Herald Tribune—radio—T.V.—Opinion. Evidence would have to be pretty strong to change it—could render impartial verdict. Siben represented juror's wife in negligence case, opinion, not prejudice. Peremptory by Defendant. |
| Martens | Followed the case closely in Newsday—Probably radio, T.V. Formed opinion—still have it. Think could render an impartial verdict. Opinion would influence verdict. Challenged for cause by Defendant. |
| Kiernan | Newsday, Herald Tribune, Journal-American, T.V. Formed opinion of guilt, still held, could change, could bring in impartial verdict. Peremptory by Defendant. |
| McHugh | Newsday, World Telegram, radio T.V.—Formed opinion, still have it. Could render impartial verdict—Victim of armed hold-up. Peremptory by Defendant. |
| Lee | Newsday, radio, T.V. Opinion still held. Could change, fair to both sides. Summer policeman—traffic. Peremptory by Defendant. |
| Hops | Newsday, radio, opinion still held, claustrophobia—excused by consent. |
| Brown | Newsday, Long Islander, Telegram, News, radio, T.V. Opinion still held—Think can render impartial verdict. Victim of two armed robberies. Challenged by Defendant for cause (bias). |
| Knoop | Tribune, Long Island Press, radio—Opinion, still held. Would not influence verdict. Peremptory by Defendant. |
| Becker | Know District Attorney, Friend of sheriff—Auxiliary policeman—Excused by consent. |
| Woodhull | Daily News, County Review, probably Newsday. Opinion still held, don't think it would influence verdict. Peremptory by Defendant. |
| Fennell | Journal-American. Opinion of guilt still held—Doesn't think it would influence verdict. Peremptory by Defendant. |
| Almasy | Long Island Press, radio, T.V., opinion still held. Could dismiss and render impartial verdict. Peremptory by Defendant. |
| Van Emmerick | Know District Attorney. Excused by consent. |
| Palmer | Newsday, possibly T.V. Opinion of guilt still held, would not affect verdict. Peremptory by Defendant. |
| Price | Newsday. Peremptory by Defendant. |
| Dewall | Peremptory by People. |
| Ten Eyck | Newsday, Daily News. Opinion, still held. Doesn't think it would influence verdict. Peremptory by Defendant. |
| Meyer | Newsday, T.V. Opinion still held. Afraid it would influence verdict. Excused by consent. |
| Shay | Excused by consent. |
| Downing | Excused by consent. |

The trial commenced April 19, 1960. Five trial days were consumed in obtaining a jury, ten in presenting evidence. The confession was admitted in evidence. Psychiatrists testified for both sides on a defense of insanity.

| | |
|---|---|
| Miller | Newsday, Daily News. Opinion still held, doesn't think it would affect verdict. Hardship. Excused by consent. |
| Oppenheimer | Daily News, radio. No opinion. Peremptory by People. |
| Gould | Attendant at mental hospital. Peremptory by People. |
| Webber | Herald Tribune—Opinion still held—Doesn't think it would influence verdict. Peremptory by Defendant. |
| Mrs. Cowan | Excused by consent. |
| Balsanek | Newsday—Opinion still held, doesn't think it would influence verdict. Peremptory by Defendant. |
| Jekle | Newsday, News, Sunday Times. Opinion still held. Could render impartial verdict. Read of the purported confession. Peremptory by Defendant. |
| Siegel | Wife employed by Siben. Excused by consent. |
| Allen | Hardship. Excused by consent. |
| Frank | Excused by consent. |
| Virag | Hardship. Excused by consent. |
| Mrs. Foster | Excused by consent. |
| Hendrickson | Newsday, Daily News. Opinion, still held. Doesn't believe it would affect verdict. Peremptory by Defendant. |
| Seaburg | Radio, Daily News, Bridgehampton News. Opinion, still held, could not render impartial verdict. For cause by Defendant. |
| Toms | Hardship. Excused by consent. |
| Glaessgen | Radio, Newsday, Long Island Press and New York papers. Health—Excused by consent. |
| Mrs. Griffin | Excused by consent. |
| Towle | Hardship. Excused by consent. |
| Farkas | Excused by consent. |
| Knaggs | Away, read no papers. Peremptory by People. |
| Ast | All papers, New York and local—Long Island Press, Newsday, Islip Press, Bay Shore Sentinel. Opinion still held would influence verdict. For cause by Defendant |
| Wisniewski | Excused by consent. |
| Wilson | Excused by consent. |
| Barry | Excused by consent. |
| Werner | Daily News, Herald Tribune, Port Jefferson Times (?). Peremptory for Defendant. |
| Mubray | Hardship. Excused by consent. |
| Campeau | Long Island Press—headlines—no opinion—Peremptory by Defendant. |
| Felton | Client of Siben. Excused by consent. |
| Albers | Daily News, Long Island Press, radio, opinion still held. Doesn't believe it would influence verdict. Knew victim. Peremptory by Defendant. |
| Orenda | New York Daily News, Newsday. No opinion. Peremptory by Defendant. |
| Biase | Newsday—opinion—Doesn't think it would affect verdict. Peremptory by Defendant. |
| Slatniski | Excused by consent. |
| Anderson | Hardship. Excused by consent. |

Bloeth himself took the stand, to tell of the history of his behavior, his crimes and incarcerations from an early age. He denied any memory of the Currier murder or of making the confession; or of the occasion of assaulting a woman with a hammer. The jury after a total of some 13 hours deliberation, brought in a verdict of guilty on the first count, murder in the first degree, calling for a mandatory death sentence, not guilty on the second count of felony murder, and guilty on the third count of robbery.

Petitioner exhausted his state remedies, including petition for certiorari to the Supreme Court of the United States, and the case is properly before us on the appeal from the two orders of the District Court denying the writ of habeas corpus.

The final test in a case such as this is whether the federal judiciary, which is the final arbiter with respect to any alleged deprivation of constitutional rights involving mixed questions of law and fact, Brown v. Allen, 1953, 344 U.S. 443, 507, 73 S.Ct. 397, 97 L.Ed. 469 (opinion of Frankfurter, J.), is satisfied that the jurors were in fact capable of, and did, lay aside their preconceived judgment, and render a verdict solely on the evidence presented in court. Since the District Court in the case at bar acted solely on a review of the available record, its findings are not based in any degree on demeanor evidence. Cf. Orvis v. Higgins, 2 Cir., 1950, 180 F.2d 537, cert. denied, 1950, 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595. If these findings are clearly erroneous, that is, if "although there is evidence to support it,

| | |
|---|---|
| Holmes | World Telegram & Sun, News Review. Opinion still held. Doesn't believe it would affect verdict. Victim of hold up. Peremptory by Defendant. |
| Smith | Client of Clarke. Excused by consent. |
| Raynor | Hardship. Excused by consent. |
| Fuoco | Employed Veterans Admin. Hospital. Mental cases. Peremptory by People. |
| Davita | Newsday—No opinion. Peremptory by People. |
| Miller | Two sons policemen. Excused by consent. |
| Wesp | Conscientious objector to capital punishment. For cause by People. |
| Duffield | Read reports—unable to give fair break to Defendant. Excused by consent. |
| Bergstrom | Read about case. Peremptory by Defendant. |
| Lehtonen | Excused by consent. |
| Appel | Hardship. Excused by consent. |
| Gagen | Peremptory by Defendant. (1 remaining for Defendant, 2 for People) |
| Clements | Knows witnesses and Defendant. Excused by consent. |
| Conklin | Hardship. Excused by consent. |
| Meyer, L. | Auxiliary police. Excused by consent. |
| Bernstein | Friend of Sider, Clarke, Siben and one of victims. Excused by consent. |
| Fagan | Client of Siben. Peremptory by Defendant. |
| Mrs. Seyford | Excused by court. |
| Peterson | Acquaintance and hardship. Excused by consent. |
| Koenig | Hardship. Excused by consent. |
| Memejer | Hardship. Excused by consent. |
| Griffin | Didn't read about case. Scruples against death penalty. For cause by People. |
| Furey | Long Island Press, Daily News. Opinion, still held. Unable to render impartial verdict. For cause by Defendant. |
| Murphy | Neighbor of District Attorney. Excused by consent. |

**372**

the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed," United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, we must reverse.

■■ We have examined the record, including the voir dire examination of the jurors challenged or excused, which was not before Judge Cashin. His conclusion that lack of impartiality of the trial jury had not been established appears to us clearly erroneous. Jury impartiality must be measured by the standards established by the Supreme Court in the line of cases culminating in Irvin v. Dowd, 1961, 366 U.S. 717, 81 S. Ct. 1639, 6 L.Ed.2d 751. There the court traced the history of the development of the rule in the face of the wide growth of crime coverage by expanding news media, pointing out the right to a fair trial by a panel of impartial, "indifferent" jurors, the growing difficulty of obtaining a panel who had never heard of a well known case, the acceptability of a juror who had some preconceived notion of guilt or innocence, provided the juror could lay aside his impression or opinion and render a verdict based on the evidence presented in court. Applying these rules to the facts of that case, however, it was made plain that merely going through the form of obtaining jurors' assurances of impartiality is insufficient. The reviewing court must determine, from a review of the entire voir dire, whether the extent and nature of the publicity has caused such a build up of prejudice that excluding the preconception of guilt from the deliberations would be too difficult for the jury to be honestly found impartial.

These standards are not met in the case at bar. The publicity was in its nature highly inflammatory, in volume great, and accessibility universal. It reached and entered the consciousness of the overwhelming majority of available talesmen. It is true that defense counsel shared with the state responsibility for much of the publicity which made the selection of an impartial jury difficult. As against this, however, there remain the considerations that much of the prejudicial matter, particularly that from the files of a state institution, and in part the attack on the insanity defense, came from the prosecution. Counsel in the jury selection failed to exhaust his challenges on the original twelve chosen (although he did exhaust them on the choice of one of the alternates, who participated in the deliberations and verdict of the jury) and counsel stated that each juror finally chosen was acceptable to the defense. But the ultimate responsibility lies with the state: It successfully opposed the change of venue requested by substituted counsel to obviate the effects of prejudicial publicity to which the District Attorney had heavily contributed. This disavowal of the tactics of Bloeth's original counsel cannot be ignored. It is true that there was drawn from jurors, even those who stated that it would take evidence to alter their opinions of guilt, the statement that they felt they could act impartially. This, however, placed on those individuals a burden we think impossible to be borne, in the light of the nature of the publicity, the high proportion of jurors holding opinions of guilt, the length of time the opinions had been held and their persistence. "The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man." Irvin v. Dowd, supra, at 727, 81 S.Ct. at 1645. Compare Beck v. Washington, 1962, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98. In the Beck case, all those who admitted bias or preformed opinion as to guilt or that they might be biased or might have formed an opinion were excused. Id. at 556, 82 S.Ct. at 963. Here there were so few that had not formed an opinion that the inquiry was mainly whether the juror could "lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, supra, at 723, 81 S.Ct. at 1643. The difficulty in this situation has been described by the First Circuit

in Delaney v. United States, 1st Cir., 1952, 199 F.2d 107, 112–113, "One cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity." We think it quite impossible that the jury here chosen succeeded in doing so.

█ It may be argued that since the trial strategy adopted by Siben and perforce followed by his successor Clarke called for emphasis on the number and brutality of Bloeth's crimes as a basis for the defense of insanity, no harm was done in choosing a jury already familiar with his otherwise inadmissible history. There are at least two insurmountable difficulties with this argument. The publicity, partly sponsored by the prosecution, created opinions of guilt long before trial, far removed from any safeguards against inadmissible matter, and included inadmissible material emanating from the prosecution denigrating the insanity defense and so predisposing the prospective jurors to reject it. A defendant is entitled to be tried on the evidence and arguments before the jury in open court, under the guidance of a judge.

The opinions formed in this case, moreover, were based not solely on accounts of the crime at issue, but on accounts of admissions of many other crimes not on trial, and on accounts containing expressions of the disbelief of the District Attorney in the lack of sanity of the defendant, with editorial attack upon the possibility of a legal loophole that by the defense of insanity would free the mad killer to strike again. The interest of the public in the knowledge of the apprehension of the one terrorizing the countryside exists, but cannot justify the denial of an impartial jury to the one accused. The record is convincing that such an impartial jury could not be obtained in Suffolk County at the time this jury was drawn for the trial of this case. While time elapsing between the original publicity and the trial might in many cases blunt the effect of publicity and obviate the need for change of venue, it did not in this case, in view of the saturation nature of the publicity in the non-metropolitan area covered. The record of the voir dire amply demonstrates that despite the interval, the effect of the publicity was little diminished at the time of trial. There is, moreover, no demonstrable difficulty in such a case as this, in providing against probable prejudice. Either a metropolitan county or a rural county at some distance, without the intense local interest and intense local press coverage would undoubtedly provide a much higher percentage of talesmen uncontaminated by improper publicity. No harm would have been done the People, either at the time of the trial or now in bringing Bloeth to trial before a jury assuredly unprejudiced by long held opinions of guilt.

█ The other principal ground for attack on the judgment below, failure of the District Judge to grant a hearing on the claimed issue of incompetent or disloyal representation by Siben, appears to us not well taken. Attempted inferences drawn from purported remarks made by Siben, reported in the press, that he acted from concern for Bloeth's family and the public in urging the confession, and the inference that he acted to curry favor with the District Attorney because then under indictment himself for the misdemeanor of solicitation of business are backed by no affidavit or offer of proof. The defense had an opportunity to explore these points when Siben and the defendant were on the stand in the state court trial. They developed nothing then or later to raise the claims above mere conjecture, and pointed to nothing new before Judge Cashin. Judge Cashin was not required to grant a hearing at this time on that claimed issue. Hindsight, of course, tells us that the advice to confess ill served the defendant, and it is indeed difficult to understand why, even if past

conduct was to be relied on to support a defense of insanity, it should not have been brought out by proof in court rather than in announcements to the press and confession, unattended by counsel, on questioning by expert police interrogators. Poor tactics of experienced counsel, however, even with disastrous result, may hardly be considered lack of due process, in contrast to failure of provision of an unbiased trier, which assuredly is a lack of due process.

Because on the record we hold that the jury drawn in this case did not meet the standards of impartiality required by the Fourteenth Amendment, we reverse the orders of the District Court appealed from, and remand for the issuance of a writ of habeas corpus, which should however be conditioned to permit retention in custody for the purpose of retrial on the indictment before a proper jury. In view of the time which has now elapsed we do not make it a condition that a change of venue be granted, provided that wherever the trial be held the jury meet the standards of impartiality outlined herein.

LUMBARD, Chief Judge, with whom MOORE and FRIENDLY, Circuit Judges join—dissenting.

In my judgment the petitioner's trial and conviction before a Suffolk County jury did not violate his constitutional rights. I would affirm Judge Cashin's denial of the petition for writ of habeas corpus.

The pretrial publicity of criminal cases which emanates from police, prosecution, or defense sources is highly undesirable. But it is not the law that such publicity in and of itself constitutes a denial of due process of law. There is a "constitutional infirmity" only if the petitioner was not tried by an impartial jury. Beck v. Washington, 369 U.S. 541, 556, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). The Beck case also makes plain that a federal reviewing court should not overturn a state court conviction on the grounds asserted here unless the jurors' inability to render an impartial verdict is so clear as to pass beyond the realm of disputable fact and to become "a matter of law." Id. at 557, 82 S.Ct. at 964. As the Supreme Court said in Adams v. United States ex rel. McCann, 317 U.S. 269, 281, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942), and reaffirmed in later cases, Beck, supra, 369 U.S. at 558, 82 S.Ct. at 964; United States ex rel. Darcy v. Handy, 351 U.S. 454, 462, 76 S.Ct. 965, 100 L.Ed. 1331 (1956), one who seeks to have a federal court set aside a state criminal conviction has "the burden of showing essential unfairness * * * not as a matter of speculation but as a demonstrable reality."

As I read the record in this case, the petitioner has failed to sustain this burden in two respects. First, in view of the passage of time between the publicity and the trial, the responses of the talesmen at the *voir dire* examination, and the nature of the publicity and the defense offered at trial, I believe that the petitioner has failed to demonstrate that the jury was prejudiced. Second, even if it could be said as a matter of law that the jury was prejudiced to some degree, this was the product primarily of acts of the petitioner's lawyer, who, moreover, had the willing cooperation of the petitioner and his family. Any acts of the prosecution which might otherwise have been prejudicial were, in effect, adopted and used by the defense for its own purposes; they may not now be complained of as a deprivation of constitutional rights.

THE EVIDENCE OF PREJUDICE

There is no question that the three murders which occurred in Suffolk County between July 31, 1959, and August 8, 1959, had become a major, if not the primary, news item in local newspapers when the petitioner was picked up for questioning on August 10. Both of the local papers, Newsday and the Long Island Daily Press,[1] extensively covered

1. Newsday had a circulation of about 100,000 and the Long Island Daily Press a circulation of about 35,000. The population of Suffolk County in the 1960 census was about 665,000.

the investigation of the petitioner's possible connection with the murders, coverage which culminated on August 14 with an article in Newsday under the banner headline, " 'Mad Killer' Confesses" and an article in the Press under the headline, "How Bloeth Murdered 3." Thereafter, as might be expected, the newspapers turned their attention from the killings themselves to the man who had confessed to having committed them. They published extensive reports of the work of the police and prosecution leading up to the petitioner's indictment for murder on August 31, and gave accounts of every available detail of his life.

So far as the record indicates, this publicity was concentrated into a period of about five days. After August 19, except for a few short articles, the newspapers apparently turned their attention, and the attention of their readers, elsewhere. On August 31 and the day following, the indictment momentarily refocused attention on the petitioner. The only article after September 1 which is included in the record is a short article in the Press on October 7, which reported that the petitioner had obtained a new attorney.

Without detailing the nature of the publicity, some of which will be considered more fully hereafter, it can be said that the articles appearing between August 10 and August 19, and particularly those appearing in the last five days of that period, painted a lurid picture of the petitioner as a multiple murderer who was at best violent and vicious, and who was possibly dangerously insane. Given the local terror engendered by three related murders in the period of nine days and the highly concentrated sensational publicity of the petitioner's

connection with them, it is probable that around August 20, most of the potential jurors in Suffolk had a belief that the petitioner had committed the murders, and that whatever ability they might otherwise have had to consider evidence impartially was affected by the recollection of terror and, perhaps, fear that any verdict other than guilty would mean a renewal of terror. Undoubtedly this state of affairs continued for some time.

But it was not until April 18, 1960,[2] eight months after virtually all of the dangerous publicity had ceased that the selection of a jury began. By that time, terror of the preceding August must have abated and the recollection of the newspaper accounts been blunted to some degree, although as the *voir dire* examination and the February public opinion poll indicate, not erased.[3] For this reason, whatever would have been the situation had the trial been conducted in August 1959 or had the publicity continued up to April 1960, in the situation as it existed on April 18, the prior publicity does not without more establish that the petitioner's trial was unfair. Compare Irvin v. Dowd, 366 U.S. 717, 726–727, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), in which the Supreme Court noted that prejudicial newspaper publicity continued up to and during the selection of the jury, with Beck, supra, 369 U.S. at 556, 82 S.Ct. at 963, in which the Court noted that the adverse publicity of which the petitioner complained had given way in large measure to other more "newsworthy" items prior to the beginning of his trial.[4]

As I understand the majority's opinion, the writ is granted here because the majority does infer directly from the fact of publicity to the fact of prej-

2. The actual examination of prospective jurors began on April 19. Preliminary matters were completed on April 18.

3. The content of the poll and its results are stated in footnote 2 of Judge Smith's opinion.

4. Among the events which occupied the news during the eight months in question

here were the launching by the Soviet Union of a space rocket which hit the moon, Khrushchev's thirteen-day visit to the United States, the congressional inquiry into the fixing of television quiz programs, and the start of the political campaigns of presidential aspirants.

udice. The February public opinion poll indicates that the public did recollect that the petitioner was connected with the murders for which he was tried, that it had an impression of his guilt based, perhaps, on its recollection that he had confessed, and that a substantial portion of the public thought in February that the petitioner could not obtain a fair trial in Suffolk County.[5] Without making much of the fact that this poll preceded the trial by two months, suffice it that the state courts are not held to the "impossible standard" of a jury all the members of which have no "preconceived notion as to the guilt or innocence of an accused." Irvin, supra, 366 U.S. at 723, 81 S.Ct. at 1642. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Id. Half of the sixteen talesmen selected in this case as regular or alternate jurors stated that they had formed no opinion of guilt or innocence. Of the other eight, each of them stated that he believed he could render an impartial verdict. Since the results of a private poll taken two months before the trial surely are not as reliable as the answers actually given by the jurors at the *voir dire* examination, I must conclude that the majority refuses to accept the jurors' estimate of themselves because in its judgment that estimate could not in the nature of things be correct. Such a determination is permitted. Irvin, supra, at 727–728, 81 S. Ct. at 1645–1646. But I believe it to be warranted only in truly exceptional circumstances. A comparison of this case with Irvin shows the absence of exceptional circumstances here. Apart from the difference in the timing of publicity and trial, this case differs significantly from Irvin. Since in that case the defense exhausted its peremptory challenges, the presence on the jury of one juror who stated that he "could not * * * give the defendant the benefit of the doubt that he is innocent," and another who said that he had a " 'somewhat' certain fixed opinion" of the defendant's guilt, id. at 728, 81 S.Ct. at 1645, suggests that the defense had done its best but that prejudice had not been entirely eliminated. There were no comparable statements by jurors in this case, and when the selection of the regular jurors was completed, the defense had still the right to excuse without cause any juror who was objectionable.

One other fact is significant. It is abundantly clear from the transcript of the examination of prospective jurors that both the prosecution and the defense anticipated that the question of insanity would be the only one seriously disputed at the trial. The record of the trial shows that this turned out to be the fact. In his opening, the petitioner's counsel made no response to the prosecution's detailed narrative of the commission of the crime charged except to say that the prosecution must prove its case beyond a reasonable doubt. He devoted almost all of his remarks to setting out facts suggesting that the petitioner was insane, and plainly indicated that no other defense would be attempted. Apart from a limited amount of cross-examination of the prosecution's witnesses, the defense devoted its entire effort to establishing the petitioner's insanity. The only witnesses called by the defense were petitioner's mother, who testified concerning her son's history, Dr. James E. Rappa, a neuropsychiatrist, and petitioner himself. Again in the summation, the defense attorney gave virtually no attention to the question whether the petitioner had committed the crime. Except for some attempt to minimize the effect of the confession, he concentrated exclusively on the question of insanity. After the jury had retired, they asked for and received the voluminous records of petitioner's mental history.[6]

---

5. It is significant, for reasons stated below, that the poll did not include any question pertaining to whether or not the people polled believed the petitioner to be insane.

6. The extent to which the defense conceded every part of the state's case except

Since it is only "essential unfairness" which merits reversal of a state court conviction, we should not ignore the fact that only the issue of insanity was ever in dispute. The defense having all but conceded every other facet of the case, it is unrealistic to say that the petitioner was prejudiced by the jurors' pre-existing opinion concerning the commission of the crime unless this opinion affected their deliberations concerning insanity.[7] There is nothing to show that this was the case. None of the prospective jurors was asked his opinion as to petitioner's sanity or even whether he had an opinion on the subject. On the other hand, every juror finally selected, and every prospective juror who was not theretofore excused or challenged on some other ground, was examined at length about his understanding of insanity as a legal defense.

Both counsel referred repeatedly to the language of New York Penal Law § 1120, which defines the defense of insanity. It was emphasized that the state had the burden of proof on this issue. So far as can be gathered from the transcript, only one person was challenged by the defense because of his views on insanity,[8] and none by the prosecution. The prosecution peremptorily challenged without further questions one person who worked in a mental hospital.[9]

We have no way of knowing whether the eight jurors who said that they had a formed opinion of the petitioner's "guilt" meant by this that they believed him to be sane. But it is at least true that we should not read into words used by laymen the expertise of a lawyer. And so far as an inference can be drawn from the publicity on which these opinions were based, the suggestion is that

Bloeth's sanity is indicated by the following exchange between Bloeth and counsel for the defense on redirect examination:

"Q. Now with reference to these answers that you gave Mr. Cohalan in the confession, you said that you had nightmares about this, is that right? A. Yes.

"Q. And did these nightmares take place after the morning of August the 8th? A. I don't know. I don't know exactly when they did. I had quite a few. I have always had nightmares of some kind.

"Q. Did you ever have nightmares about this incident, or about a woman dying? A. Well, I've had them about quite a few people dying, being killed and stuff. I don't—you see, I don't, I don't know exactly when I have them. Just sometimes I remember them, sometimes I don't, I don't know. I—I

"Q. When you say you don't know, you are not saying, you are not denying you did this, you are not saying you were somewhere else, are you? A. No, I just don't remember anything, where I was or anything. I mean I heard people say I was, some people say I was here and some people say I was there. I don't know where I was.

"Q. So, so far as you know, that confession could be perfectly true, is that correct? A. Yes, it could be."
Record on Appeal to the New York Court of Appeals, p. 1006.

7. Contrast Irvin v. Dowd, supra. In that case, in which two-thirds of the jurors

had expressed an opinion of guilt, id. at 728, 81 S.Ct. at 1645, that opinion bore directly on the issues at trial. No question was raised at the trial about Irvin's legal responsibility for the crimes charged if he had in fact committed them, nor did anyone anticipate that this issue would be raised. In the entire voir dire examination, covering almost 3000 pages of the transcript, there is no mention by either side of the issue of insanity. Transcript on file with the clerk of the Supreme Court of Indiana.

8. Adolph Almasy, who responded affirmatively to the following questions by the defense:

"Actually do you feel a person to be legally insane would have to have some outstanding physical characteristics per se?"

"In other words, you feel for somebody to be legally insane they would have to be unable to function, they couldn't, say serve as a brother officer in the army or hold down a job or something of that nature?"

"You would feel he would have to show outward manifestations of an inability to function or operate?"
Transcript of examination of prospective jurors, p. CC 29.

9. Joseph J. Fuoco. Transcript of examination of prospective jurors, p. DD 154–55.

these jurors had not prematurely re- solved the question of insanity against the petitioner. The vast bulk of the publicity was a recounting of details which would lead most people to have doubts about the petitioner's sanity. (In any event, of course, these jurors, like the others, stated at the *voir dire* exam- ination that they could consider the evi- dence at trial and decide on that basis alone.)

I do not condone the pretrial publicity which the prosecution or the defense gave to this case. But our sole function is to ensure that the petitioner has not been deprived of his constitutional rights. In my judgment, the petitioner has not shown "as a demonstrable real- ity" that he was not tried by an impar- tial jury.

### The Conduct of the Defense

Even were I to accept the conclusion of my brothers that the publicity given this case by the prosecution would, if standing alone, require reversal, the fact is that far from being prejudiced by it, the defense welcomed and added to it. It was the strategy of the defense almost from the day on which the peti- tioner was arrested to broadcast as wide- ly as possible every fact and argument which would support the theory that petitioner was insane and not legally responsible under New York law. Nor was this a situation where the defense was forced to publicize its cause in or- der to mitigate the prejudice created by the prosecution. From the outset, the defense took the lead in providing the newspapers with information. Having embarked on a publicity campaign, the defense should not now be heard to com- plain of a violation of constitutional rights because its strategy failed.

It is true that the district attorney ex- pressed to reporters his opinion that the

petitioner was sane. But this voice from the other side was drowned in the up- roar created by the petitioner's counsel, his family, and by the petitioner him- self. Over and over again they were quoted as saying that the petitioner was "mentally deranged" or "sick," or "in- sane." His mother told reporters about his childhood and said that she had "known for a long time that he's been a Jekyll-Hyde character." [10] She informed them that he had always been in trouble and that when he was young she had "signed the paper to have him sent to Kings County Hospital for observation, but they just said he was mentally dis- turbed and they wouldn't put him away." [11] The petitioner's wife told re- porters that he had admitted to her that he had broken the back of a dog when he was twelve;[12] that "from the things he said to me about death * * * the way he talked about it so much * * * his constant fights and then the trouble with the police again and again * * * I knew he was mentally sick";[13] that she tried to persuade him to go to a hos- pital and undergo hypnosis to find out "what's really wrong" with him.[14] She quoted him as saying:

> "Jane—you mustn't feel bad about all this. It's not your fault. You've been a wonderful wife to me, but all my life things have been this way. It's sort of free will. It was bound to happen. I knew I had to rob and kill those people. They were meant to die. It was their time. I was just the instrument. If I get the chair, then that's how it has to be. I always knew some- think [sic] like this would happen. It's my destiny." [15]

His counsel repeatedly expressed his opinion that the petitioner was insane, sometimes taking care to phrase his opinion in terms suggestive of the New

10. Newsday, August 15, 1959.

11. Id.

12. Id.

13. Long Island Daily Press, August 14, 1959.

14. Id.

15. Newsday, August 18, 1959.

York insanity statute.[16] He kept reporters informed of the steps being taken to establish the defense of insanity.[17] He described the petitioner in terms calculated to engender the horror of the dangerously insane. The following statements are typical:

"He doesn't know right from wrong. He enjoyed the killings. He shows absolutely no feeling of remorse about them.

"He is the most cold-blooded murderer I have met in my 25 years of dealing with criminals as a lawyer." [18]

"[He is] * * * as mad as a hatter and I intend to prove it with the help of a psychiatrist who is investigating Bloeth's background. No man could gleefully boast about such terrible crimes without being insane." [19]

He told reporters that he believed the petitioner had committed other crimes,[20] and then informed them that the petitioner had confessed to him other crimes including burglary, larceny, safecracking, robbery and assault.[21] The petitioner had no reluctance to speak to the press. One article quoted him as saying to reporters, "I'd have been a terror if I'd been with Castro," and to newsreel cameramen, "Don't forget to put me in for an Academy Award. I'm giving you guys a real show today." [22]

An examination of the publicity of which the defense now complains shows clearly that most of it emanated from the defense itself. Without the willing cooperation of the people surrounding the petitioner and the petitioner himself, the newspapers would have been able to say much less than they did. The motion for change of venue was made on February 19, 1960, more than five months after the defense-inspired publicity had died down. I do not understand why the defense, having adopted its strategy and pursued it with full vigor, should be permitted to avoid the effects of its own acts when the strategy has failed.

It does not necessarily follow from the fact that some publicity adverse to the defendant came from state sources that the whole process of criminal prosecution and trial was thereby tainted. As stated above, our function is solely to protect the rights of the accused. When, as here, a defendant who is aided by counsel follows a course which renders without significance what the state had done, there is not that fundamental unfairness which requires federal action. See United States ex rel. Reid v. Richmond, 295 F.2d 83, 87–90 (2 Cir.), cert. denied 368 U.S. 948, 82 S.Ct. 390, 7 L.Ed.2d 344 (1961). In such a case there is no prejudice, and our interference is neither required nor justified.

I agree with my brothers that the other claims of error below are without merit.

I would affirm the order of the district court which denied the writ.

16. Newsday, August 14, 1959; Newsday, August 15, 1959; Newsday, August 18, 1959; Long Island Daily Press, August 15, 1959; Long Island Daily Press, August 16, 1959.

17. Newsday, August 15, 1959; Newsday, August 17, 1959; Newsday, August 18, 1959; Newsday, August 20, 1959; Long Island Daily Press, August 15, 1959; Long Island Daily Press, August 16, 1959; Long Island Daily Press, August 17, 1959;

Long Island Daily Press, August 18, 1959.

18. Long Island Daily Press, August 15, 1959.

19. Newsday, August 18, 1959.

20. Newsday, August 17, 1959; Long Island Daily Press, August 17, 1959.

21. Long Island Daily Press, August 18, 1959.

22. Newsday, August 15, 1959.