**UNITED STATES of America ex rel. Vincent CERULLO, Petitioner-Appellee,**

v.

**Hon. Harold W. FOLLETTE, as Warden of Green Haven Prison, Stormville, New York, Respondent-Appellant.**

**No. 635, Docket 33381.**

United States Court of Appeals Second Circuit.

Argued April 25, 1969.

Decided Oct. 2, 1969.

J. Kenneth O'Connor, New York City, for appellee.

Amy Juviler, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Brenda Soloff, Asst. Atty. Gen., of counsel), for appellant.

Before LUMBARD, Chief Judge, ANDERSON, Circuit Judge, and WYATT, District Judge.*

WYATT, District Judge:

The Warden of Green Haven Prison appeals from an order of Judge Tyler granting an application of Vincent Cerullo for a writ of habeas corpus. Cerullo is serving a sentence for first degree robbery and other offenses imposed after a jury verdict in a trial in the New York Supreme Court for Nassau County. A co-defendant at the trial, Carmine Moccio, was convicted of the same offenses.

There have been extensive proceedings in the state courts, the District Court and in this Court—all involving the claim by Cerullo that two statements admitted against him at trial were involuntary because coerced by police beatings. When the matter was last before this Court on an appeal by Cerullo, it was remanded "for a full hearing" (393 F.2d 879). Judge Tyler had that hearing (the second hearing before him) after which he filed an opinion, the gist of which was that he had a "smidgin of doubt" whether the confessions were involuntary and that the "smidgin * * * is sufficient to create a reasonable doubt and to require * * * that Cerullo's conviction be set aside" (294 F.Supp. at 1289–1290).

After considering the substantial new evidence produced before Judge Tyler and after making a detailed study of the entire record, which is now adequate, we are convinced beyond a reasonable doubt that there were no police beatings and that the two statements of Cerullo were voluntary. We have the definite and firm conviction on the entire evidence that Judge Tyler's contrary conclusion is mistaken. United States ex rel. Bloeth v. Denno, 313 F.2d 364 (2 Cir.1963), cert. denied 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963); United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). The order below must therefore be reversed. While so doing, we recognize that Judge Tyler was undoubtedly led into error because doubts (from an incomplete record) as to the treatment given Cerullo by the police were too strongly expressed in the earlier opinion of this Court.

The procedural history of the matter in the state and federal courts is set out in our earlier opinion and need not be repeated.

The single issue is whether the police beat Cerullo until he signed the two statements.

* Of the Southern District of New York, sitting by designation.

## The Testimony of Cerullo

Cerullo testified at his trial on this subject and on nothing else. Cerullo swore that while going from one police station to another, he was handcuffed with his hands behind his back and that a detective hit him in the head with a black heavy object so hard that he lost consciousness and had to be taken from the car when they reached the second police station; that within a few minutes he was handcuffed to a chair for one or two hours while detectives took turns punching his chest and stomach with their fists; that a telephone book was then put on his head and a detective hit it on top many times with a hard and heavy object; that pains went right down his spine; that the detectives kept asking him "to sign" and he kept denying everything; that he was screaming with pain; that more detectives came in, "all big fellows"; that four of them now spreadeagled him on the floor, stepping on his arms and legs to hold him down while four others took turns hitting him with black jacks; that "they were asking me to sign papers all night. They had a stack of them"; that he couldn't tell "if it took ten minutes or ten hours"; that he was then handcuffed to the chair again; that he was then spreadeagled on the floor again; that he was then put with a number of other men in a line-up; that they then arched his back over a chair, and, while one held his feet, others for "quite a while" kept punching his stomach and chest with their fists; that he continued to scream; that finally he said "I'll sign anything * * * Stop, I can't take it any more"; that he then signed the statements, not reading anything; that he does not remember whether the pages he signed were blank or had been filled in; that when he signed the time was about 1 p. m. on October 4; and that they left the station house about 20 or 30 minutes later.

At trial, counsel for Moccio contended that his statements also were involuntary because the result of police beatings; Moccio did not testify. We are told that since the decision here on appeal, Moccio has applied for a writ of habeas corpus to the District Court for the Eastern District of New York.

Cerullo, although present at both hearings before Judge Tyler, did not testify at either of the hearings and has never testified in the district court to his claim; he rests on his testimony at trial in the state court.

The only evidence which might arguably support the claim is certain testimony of Dr. Vivona, the prison physician in Nassau County. This testimony was given at the state court trial, since which and before any hearing in the district court, Dr. Vivona died. The testimony of Dr. Vivona to a considerable extent influenced the earlier decision of this Court to direct a full hearing.

Before discussing the effect on Cerullo's claim of the evidence received at the second hearing before Judge Tyler, it is well to set out chronologically certain facts established by the evidence as a whole, largely from the police officers and (aside from the issue with Cerullo and Moccio as to the beatings) not substantially contradicted.

## The Chronology

On September 21, 1962, several men robbed a home in Nassau County, after tieing up the elderly widow whose home it was.

About 6 p. m. on Wednesday, October 3, 1962, Quinn, a state parole officer, talked to Moccio at his sister's house in Brooklyn and under a parole violator warrant took him into custody. Quinn told Moccio that, according to the Parole Board's information, he was not in fact working for his supposed employer and that this was a parole violation. A few minutes later, three detectives of the Nassau County Police Department came on the scene. Moccio was then taken to a station house in Hewlett, Nassau County.

At the station house, Moccio was taken to the squad office on the second floor and was questioned. At the begin-

ning Moccio denied knowing anything about the robbery. He was then told that the victim had identified him from a photograph as one of the robbers and that she would be brought in to face him directly. Moccio then said he would tell about it and, as an officer typed it out in the same room, Moccio told his story. The statement was finished about 9 p. m., Moccio read it, said it was true and signed it. This statement implicated Cerullo, Paul DeFiore ·and two others.

Quinn, the state parole officer, stayed in the station house until about 2 a. m. on October 4, 1962, and was in and out of the room where Moccio was being questioned.

Based on information supplied by Moccio, the police found in Far Rockaway the truck which the robbers had used. They got a tow about midnight and started for the station house in Hewlett; they must have arrived shortly before 1 a. m. on October 4. At about 1 a. m. on October 4, 1962, Moccio and an officer talked about the truck in the driveway of the station house; the officer then typed a second statement, which Moccio read and signed. Moccio identified the truck as the one he and the other robbers had used.

Meanwhile about 9:30 p. m. on October 3, three detectives had gone to arrest Paul DeFiore at his apartment in Brooklyn. After injuring himself in an attempt to escape, DiFiore was arrested. He was told that the police had the truck and Moccio and knew what had happened. Then DeFiore told his story and implicated Cerullo, Moccio and the two others.

Two detectives then went to arrest Cerullo. At about 3 a. m. on October 4, 1962, they reached the Cerullo apartment in Brooklyn. They put him under arrest for robbery and took him away, leaving a police telephone number with his wife. He was booked at a police station in Brooklyn and possibly questioned for a short time. He was then taken to the police station in Hewlett, arriving there about 4 a. m. An officer sent out for coffee and sandwiches; Cerullo had

coffee but did not want a sandwich. Beginning at about 4:30 a. m., Cerullo was questioned for about thirty minutes about the robbery; Cerullo admitted nothing.

The detective who had found the truck went back after daylight to look for the decoy package which the robbers had used. At about 5:30 a. m. on October 4 he found the heavy pipe and the cardboard box (which together made up the decoy package) at a spot about ten feet ahead of where the truck had been abandoned. He brought these articles back to the station house.

Two detectives began questioning Cerullo in the squad office at about 8:30 a. m. on October 4. Cerullo was told about DeFiore, his attempted escape, his injury, and his confession; a detective said that DeFiore had told "exactly what he did in this part of the robbery." Cerullo said he was worried about his wife but that since DeFiore had told "his part" Cerullo would tell "my side." Detective Altomare then took a statement from Cerullo, typing it out as Cerullo dictated. As he dictated, Cerullo was drinking coffee from a container. After the statement was typed up, Cerullo read it, pointed out a correction in the spelling of a word, initialed the correction and between 10:30 and 11 a. m. on October 4 signed the statement. This statement became a People's Exhibit at the trial. After this, a piece of heavy pipe was brought in. Altomare showed Cerullo this pipe; Cerullo identified the pipe as the one which was in the decoy package used by the robbers. Altomare then typed a shorter second statement which Cerullo read and signed. This second statement became a People's Exhibit at the trial.

On this same morning, October 4, Quinn, the state parole officer, was at the Hewlett station house and at some time after 10:30 or 11 a. m. interviewed Cerullo in order to find out the connection between him and Moccio, who was under Quinn's parole supervision.

About 11:30 a. m. on October 4, Detective Holmes (in charge of the case)

talked to Cerullo with Altomare, who had in hand the two statements earlier signed by Cerullo while Holmes was absent. Altomare read the statements to Cerullo. Holmes asked Cerullo if the statements were true and he said that they were. Holmes signed the two statements as a witness.

Cerullo and Moccio were then taken together from the station house to the Nassau County Police Headquarters, arriving there about 12:45 p. m. on October 4. They were fingerprinted and photographed between 12:50 and 1:20 p. m.

In connection with the fingerprinting and photographing at Police Headquarters, Cerullo signed and wrote his address at the bottom of a completed and very detailed information form for police records.

Cerullo and Moccio were next taken to the state court house where they were placed together in a detention cell on the second floor. Between 3 and 4 that afternoon they were brought for arraignment in the state court. They were told of the charges against them and were asked if they wanted counsel. They both said that they wanted counsel and the arraignment was then adjourned to permit them to secure counsel. Bail was denied.

They were taken later that afternoon to the Nassau County Jail. They left the detention cell in the court house at 5:30 p. m. and were admitted to the jail about an hour later.

As to Cerullo, the admitting officer (Sergeant Tringali) took information from him for a record. He noted that Cerullo's health was fair and: "claims he fell, possible rib fracture."

As to Moccio, the admitting officer, on the basis of Moccio's statements, noted his health as good.

Their clothes were taken from Cerullo and Moccio, they were given showers, issued jail clothes and, because the jail was crowded, they were given cots in an open area of the jail where they could be together.

The following morning (October 5) the jail physician, Dr. Vivona, made an examination of Cerullo and Moccio. This was not because of any suggestion or request of theirs but purely as a matter of jail routine. Dr. Vivona noted as to Cerullo: "claims he fell down in Police Station," also "pain over right chest, upper abdomen and right side of head."

As to Moccio, Dr. Vivona noted: "claims he fell down," also "pain lower abdomen."

Either on that day or later, Dr. Vivona sent Cerullo to Meadowbrook Hospital to have an X-ray taken to see if he had a fractured rib. The X-ray was made on October 9 and showed that there was no fractured rib.

The adjourned arraignment of Cerullo took place on October 10.

An indictment was returned in Supreme Court, Nassau County, on October 23, 1962, naming Cerullo, Moccio and DeFiore as defendants.

In May 1963, the case of DeFiore was severed from the other defendants; he later pleaded guilty to attempted robbery in the second degree.

Under date of May 17, 1963, Cerullo wrote a letter to the Clerk of the United States Supreme Court. In this letter he states, among other things, that he was "held for 62 hours in a police station * * *. During this time I was tortured mentally and beaten physically and forced to sign blank papers which I am sure the police typed confessions on."

### The Second Hearing

There was a great deal of significant evidence presented by the State which had not previously been in the record. The hearing was conducted by Judge Tyler in a thorough and painstaking fashion, as had been the first.

The State produced the photographs of Cerullo which had been made, as already described, between 12:50 and 1:20 p. m. on October 4, 1962. This was almost immediately after Cerullo claims he signed the confessions after having been beaten for hours to the point that

he "couldn't take the beating any more" and would "sign anything." The photographs show a man in normal condition; no man who had had strong police officers hitting him in relays, as Cerullo testified, over a period of hours, all while he was screaming in pain, could possibly look like the man in these photographs.

The medical record librarian from Meadowbrook Hospital produced the records of the examination and X-ray of Cerullo on October 9, 1962 and interpreted these records to mean: "the findings are normal, nothing is wrong with the patient."

Dr. Goldstein testified for the first time. He was an intern at Meadowbrook Hospital in October 1962 and is now a resident physician at Flower-Fifth Avenue Hospital in Manhattan. The medical records show that he did the examination of Cerullo on October 9, 1962. While he did not remember Cerullo, he had no doubt from the records that Cerullo had no fractures because if there had been any such indication, he would have obtained a second opinion. If there had been any marks or bruises on Cerullo or any injury visible, he would have written it down; there is nothing written down of this sort. If Cerullo had been beaten as Cerullo claimed, "it has to show eventually * * * initially as a black and blue area and after that as it absorbs you would see it as a yellowish area on the skin."

The State produced Tringali, in 1962 a Nassau County police sergeant and now employed by Grumman Aircraft on Long Island. His testimony was that he admitted Cerullo and Moccio to the Nassau County jail about 6:30 p. m. on October 4, 1962; that he was able to identify Cerullo in court; that he took information from the prisoners and put it down on a pedigree sheet, which they signed; that if a prisoner were seriously injured or sick, this would be noted and he would be sent to a hospital or a doctor called; that in the case of Cerul-

lo, he remembers Cerullo as seeming tired but that there was no indication of injury or illness; that had there been any such, it was jail policy and practice to put it on the pedigree; that had Cerullo asked for a doctor, the sergeant would have noted this also, and would have called Dr. Vivona for permission to send him to a hospital; and that Cerullo was offered the use of a telephone to make a call, as is the usual practice, and he declined to make any call.

Officers Holmes and Altomare testified at this second hearing before Judge Tyler; they had not testified at the first hearing. All other officers who had seen Cerullo in the relevant period had testified at the first hearing.

Altomare had actually typed the two statements signed by Cerullo and he and Holmes had signed them as witnesses.

Cerullo was present at both hearings and heard the testimony of all the officers including the important testimony of Holmes and Altomare at the second hearing; he did not testify thereafter. Judge Tyler therefore could only look to the written record of the testimony given by Cerullo in the state court.

At the two hearings, Cerullo heard all the police officers testify and deny to Judge Tyler that they ever beat Cerullo. If in fact he had been the victim of such beatings, it would seem only natural for Cerullo to give an account of this to Judge Tyler. Yet he elected to rest on the typed transcript from some five years ago.

Although at one point counsel for Cerullo indicated that he would present "independent medical testimony of my own," no such was produced.

The only witness produced for Cerullo was his brother Lawrence. It is not necessary even to summarize his testimony because Judge Tyler found it "unworthy of belief" (294 F.Supp. at 1288).

Counsel for Cerullo declined to call Moccio as a witness, as did the state. Moccio testified as a witness called by the court. Judge Tyler obviously did not believe him but made no direct find-

ing. Judge Tyler said: "Moccio's appearance, demeanor and testimony cast curious lights and shadows upon Cerullo's basic position in his petition for habeas corpus relief."

### Earlier Evidence Supported by That at the Second Hearing

The new evidence at the second hearing added great strength to what already appeared in the record to show that the Cerullo statements were voluntary.

Moccio telephoned his relatives on the night of October 3–4; there was no complaint of police brutality.

When he was at Police Headquarters on October 4 after the claimed beatings, Cerullo signed and wrote his address at the bottom of a completed and very detailed information form for police records. Much of this information could only have come from Cerullo himself; much of it related to his physical condition, such as "scars and marks," "tatoos," etc. There is nothing to indicate any slightest injury to Cerullo, nor could he have signed this form and helped in its completion if in fact he had suffered even one-half the physical abuse to which he later testified and now claims.

At his arraignment in open court on October 4, 1962, Cerullo made no complaint of any beatings to the judge or to anybody else, nor did his then appearance—shortly after the alleged beatings —suggest any injury to him.

When admitted to the Nassau County Jail and a long personal (including health) history was taken, Cerullo made no complaint about anything and refused the offer of a telephone call.

In his letter to the Supreme Court of the United States, Cerullo stated that he had been held in a police station "for 62 hours." In fact, even on Cerullo's own trial testimony, the maximum period was less than 12 hours; he said at trial that he was arrested in his apartment about 2 a. m. on October 4 and that he left the police station at about 1:30 p. m. the same day.

Cerullo told the Supreme Court that he was "forced to sign blank papers"; at trial he said he could not remember whether they were blank or not.

An examination of the statements themselves shows that they must have been typed before Cerullo signed them. For example, on the first page of the first statement, there is, in the second line from the bottom, the words: "Then Paulie and Carmine tied up the woman with venition [so in the original] blind cord that we had brough." The last word is not completed in type because it ran off the right edge of the sheet. The last line continues: "in Brooklyn." It would seem that the expression should be: "bought in Brooklyn." Cerullo took a pen, crossed out the unfinished typed word and put above it with the pen and ink the word "brought" and put his initials alongside. He may have intended simply to have the word completed or to change it to "bought"; he claimed that "a detective made me do that." In any event, he admitted that the writing was his and it is thus established that the page was typed before he signed it. Moreover, on this page and on the one page second statement parts of the signatures cross one or more typed letters above. Close inspection shows that the handwriting is over the typed letters.

The signatures of Cerullo to the two statements admitted against him are firm, straight and plain; no man who had been beaten as Cerullo claims he was beaten could possibly have written such signatures.

Quinn, the state parole officer, testified at the first hearing before Judge Tyler. When he gave this testimony, he had become a Special Agent of the Federal Bureau of Investigation. He was at the station house from 6 or 7 p. m. on October 3 to 2:30 or 2:45 a. m. on October 4. He returned about 10:30 or 11 a. m. and after his return, interviewed Cerullo, whom he could identify in court. The reason he interviewed Cerullo was to find out the connection between him and the parolee Moccio. He and Cerullo were alone in a room for 5 to 10 minutes

and after he explained his purpose Cerullo answered his questions "without any objection." To Quinn, Cerullo appeared to be in good physical condition, had no bruises or marks, made no complaints, and walked naturally. Judge Tyler found Quinn "very frank and impressive" (294 F.Supp. at 1288).

A former FBI Agent Duffy, now employed by American Express Company, testified that as an agent he was on the second floor of the station house next to the room where Cerullo was questioned, or near it, from about 8:30 p. m. on October 3 to about 10:30 a. m. on October 4. He said that he heard no unusual sounds, noises or screams from the room where Cerullo was. He saw Cerullo at the time of the lineup about 11 a. m. on October 4. Cerullo seemed normal, with no signs of pain or suffering. Judge Tyler found Duffy to be a "persuasive witness" (294 F.Supp. at 1288).

As to the testimony of the police officers and detectives, all of whom denied ever striking Cerullo, Judge Tyler at the first hearing found it "generally credible" although with "discrepancies" which were "minor."

As to the particular two hour and forty-five minute period on the morning of October 4, 1962 on which Judge Tyler concentrated at the first hearing and during which Cerullo claimed to have been beaten, Judge Tyler had found "there is no credible evidence which persuades me that there was any beating or physical violence or punishment done to the body of the relator, Mr. Cerullo."

### The Basis for the Decision Below

The significant new evidence presented at the second hearing confirmed all the findings previously made by Judge Tyler. Nonetheless, apparently under the influence of the overemphatic expression of doubt by this Court in its earlier opinion, the new evidence was disregarded.

Judge Tyler referred to "the contusions, evidence of which Dr. Vivona testified he discerned or found on October 5, 1962." Judge Tyler continued: "It is also possible, of course, that Cerullo was injured at a time before his arrest. Nevertheless, there remains the smidgin of doubt created by Dr. Vivona's testimony which, as I have already observed, is not explained by the state. That smidgin, however, is sufficient to create a reasonable doubt and to require under the applicable law, already discussed, that Cerullo's conviction be set aside." (294 F.Supp. at 1289–1290).

We do not believe that use of the somewhat quaint word "smidgin" was intended to introduce any new element into the definition of reasonable doubt; if so, it must be disapproved.

Judge Tyler found that aside from Cerullo's testimony ("highly colored") there is no "direct evidence" that he was beaten. It is only the testimony of Dr. Vivona which caused him to have a reasonable doubt.

### Our Difference With the Court Below

The new evidence at the second hearing, when added to that already of record, convinces us beyond a reasonable doubt that Cerullo had no injuries and, if he did have any, that they were sustained before his arrest.

We believe that, in the light of all the other evidence, Judge Tyler gave too much weight to the testimony of Dr. Vivona in the state court. The same transcript of that testimony is before us as was before Judge Tyler; no demeanor impressions are in question.

Cerullo admitted in his testimony that he did not tell Dr. Vivona about being hit and beaten when Dr. Vivona examined him on October 5. He swore, however, that when admitted to the jail the evening before he had asked the admitting officer "if I could see a doctor," that "I was hurt." Nothing of this kind appears on the admitting officer's record. Dr. Vivona testified that had Cerullo "requested medical attention" when admitted to the jail on October 4, "he would have been seen the same night."

The doubts expressed in the earlier opinion of this Court were based in large part on the inadequacy of the record to show how Dr. Vivona came to note "contusion" on the record of his October 5 examination of Cerullo, especially whether it was based entirely on complaints of pain of Cerullo himself. The additional evidence, in particular the testimony of Dr. Goldstein, satisfies the doubts expressed.

It may first be noted that Dr. Vivona's testimony was based largely, if not entirely, on his records. For example: "Q. Now do you have any independent recollection of your treatment of Vincent Cerullo. A. I have to go by my record." From his record, however, Dr. Vivona could be perfectly clear and definite as to the physical condition of Cerullo.

Dr. Vivona was perfectly clear and definite that there was "nothing visible" on the body of Cerullo to indicate any injury. The doctor nevertheless made notations of contusions of the right chest, upper abdomen and right side of the head and possible fractured ribs (later disproved by X-ray). He defined a contusion as "a subcutaneous injury, an injury under the skin, where the skin is not broken whatsoever." He testified that *some* contusions *can be seen and others cannot be seen.*

A medical dictionary states for "contusion" (Taber's Cyclopedic Medical Dictionary, C–83):

"An injury in which the skin is not broken. SYM: Pain, swelling and discoloration."

Since there was no swelling nor discoloration visible, this leaves only "pain" as a symptom. Pain can only be reported by the patient himself, à report impossible to determine whether true or false. As Dr. Vivona testified, he gave Cerullo "tablets for his pain, *if he had any pain*" (emphasis supplied).

As to the contusions claimed by Cerullo, Dr. Vivona was emphatic:

"Q. Do those records indicate in any way whether those contusions were visible? If they were visible here, we would have had it put down on the record. They were not visible. We find this only on examination." When Dr. Vivona speaks about finding contusions "only on examination," he means merely that he palpates, or feels, the region indicated by the patient or is "pushing on it" and then has the patient tell him whether it hurts or not; if the patient tells the doctor it hurts, then he notes in his record some tenderness there. Of course, as Dr. Vivona testified, there is no way for the doctor to tell whether, when the patient tells him that the exploration hurts, this is the truth or not; he has "to take the patient's word." Cerullo said that "it hurt him" and "he fell down in the police station." Whether Cerullo was telling the truth at the time is a question of fact, determined against him by the judge and by the jury in the state court.

Assuming that Cerullo had a contusion, Dr. Vivona was unable to say when it was sustained: "a contusion can last a week, ten days, two weeks." Since Dr. Vivona saw Cerullo on October 5, 1962, the day after his arrest, his testimony means that *if Cerullo had any injuries* he could have sustained them two weeks before his arrest.

Finally and especially, Dr. Goldstein, heard for the first time at the second hearing, testified that when pain is referred to in medical records, this is not a finding by the doctor; that there are three symptoms of contusion: a "swelling," "a black and blue spot on the skin," and "pain over this area"; that by feeling (palpation) you can discover whether you "get a response" so as to determine whether the patient feels pain but that by feeling you cannot discover whether a patient is malingering or not. The evidence is clear that there was no swelling or discoloration on Cerullo's body; thus any finding of Dr. Vivona could only have been based on complaints of Cerullo himself.

On all the evidence, the testimony of Dr. Vivona does not create any reason-

able doubt and the decision below was in error.

The order appealed from is reversed and the cause remanded with directions to dismiss the application on the merits and to discharge the writ. It appears that the District Court on January 30, 1969, ordered the release of Cerullo, pending this appeal, on $5,000 bail in the form of a surety bond. The District Court is directed to revoke the bail and to require the return of Cerullo forthwith to the custody of the appellant Warden of Green Haven Prison. The mandate will issue forthwith.