UNITED STATES of America ex rel.
James C. HAYNES, Petitioner,

v.

Charles L. McKENDRICK, Warden, Wallkill State Prison, Wallkill, New York, Respondent.

No. 70 Civ. 3041.

United States District Court,
S. D. New York.

Oct. 25, 1972.

Michael Meltsner, Columbia University School of Law, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen. State of New York by Michael Colodner, Asst. Atty. Gen., New York City, for respondent.

## OPINION

MOTLEY, District Judge.

On December 11, 1965, at approximately 9:00 P.M., three men robbed a delicatessen in Niagara, New York, of about $130.00 in bills and coins. In the course of the robbery, one of the robbers hit a customer of the delicatessen with a gun, knocking him unconscious and taking his wallet and money. This robber was wearing a beige trench coat, a black beret, and a mask which covered his mouth. He was pursued by two policemen who saw him running out of the delicatessen, but he escaped apprehension after a chase. In the meantime, two other officers had come on the scene and, after losing sight of this suspected robber for a brief time, spotted petitioner and arrested him.

At the time of his arrest, petitioner was wearing a beige trench coat and black beret. Two black stockings, which appeared to fit the description of the robber's mask, were discovered in his pockets along with over $25.00 in change and $73.00 in bills, only $20.00 of which was in his wallet.

Petitioner was taken to police headquarters where he was placed in a series of lineups and identified by three witnesses to the robbery, including two who claimed to have known petitioner previously. All three witnesses identified petitioner at trial as did a fourth eyewitness who claimed to have seen petitioner in front of the store before he put on his mask. Petitioner steadfastly professed his innocence before and after his arrest. At trial, he presented an alibi defense through his own testimony, elements of which were corroborated by various defense witnesses.

During the night of the robbery, the police also arrested a 17 year old, Terry Fox, after he had been named by an eyewitness as a participant in the crime. Cox was identified in a lineup that night and signed a confession the following morning. At trial, Cox denied the truthfulness of the statement, charging that he was scared at the time and that he was told that he would go free if he confessed. The confession referred to the fact that "the stout fellow [one of the other two robbers] told the people in the store to stick em up."

Petitioner, Cox, and a third co-defendant, Norman Jones, were subsequently indicted and were brought to trial in the County Court of Niagara County, New York on March 2, 1966. At the end of the taking of testimony, but before the summations by counsel, the District Attorney was granted a motion to dismiss the indictment against Jones for lack of evidence against him.

On March 19, 1966, the jury returned verdicts of guilty against both petitioner and Cox on five counts of robbery in the first degree, one count of grand larceny in the first degree, and one count of petit larceny. Petitioner was sentenced to a term of from ten to twelve years on the robbery counts and a concurrent term of five to ten years on the grand larceny count. On direct appeal, the Appellate Division affirmed the judgment of conviction without opinion[1] and leave to appeal to the Court of Appeals was denied in April, 1970.

Petitioner now seeks a federal writ of habeas corpus to release him from Wallkill State Prison, Wallkill, New York, where he is presently serving his term. He raises several claims of federal constitutional error in the state proceedings, which the court shall consider *seriatim*. Unless otherwise noted, petitioner's claims were presented to the state appellate courts and are cognizable here. 28 U.S.C. § 2254(b) (1970).

## I. *The Lineups*

Petitioner contends that his constitutional rights were violated during the post-arrest lineups conducted for identification purposes in that 1) he was denied counsel at the time, and 2) the procedure utilized denied him due process of law. Since the lineups were conducted in 1966, the right to counsel claim is clearly without merit. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). While petitioner's due process claim may have substance,

he neither raised it on direct appeal of his conviction nor in any other post-conviction proceeding in the state courts.[2] Thus, petitioner has not satisfied the exhaustion requirement of 28 U.S.C. § 2254(b)[3] and must first seek redress on this claim through presently available remedies in the state courts, viz., N.Y. C.P.L. 440.10 (McKinney's Consol.Laws, c. 11–A, 1971) (motion to vacate judgment) or N.Y.C.P.L.R. § 7002 (McKinney 1963) (habeas corpus).

## II. *Dismissal of Charges against Jones*

Petitioner's second contention is that the trial court committed error when it granted a motion by the District Attorney, in the hearing of the jury, to dismiss charges against co-defendant Jones. See Trial Record, Vol. IX, at 2–6. The motion was made and granted prior to summations by counsel[4] and the trial judge gave proper cautionary instructions at the time. This court does not think that petitioner's contention raises a claim of federal constitutional error and, therefore, the court cannot entertain this part of the application. 28 U.S.C. §§ 2241(c), 2254(a)(1970). Cf. United States v. Edwards, 366 F.2d 853, 870 (2d Cir. 1966), cert. denied, Jakob v. United States, 386 U.S. 908, 919, 87 S.Ct. 852, 17 L.Ed.2d 782 (1967) (guilty plea of co-defendant during trial made known to jury); United States v. Aronson, 319 F.2d 48, 51–52 (2d Cir. 1963), cert. denied, 375 U.S. 920, 84 S. Ct. 264, 11 L.Ed.2d 164 (1963) and cases cited therein.

1. People v. Haynes, 33 A.D.2d 893, 308 N.Y.S.2d 316 (4th Dept.1969).

2. In his brief to the Appellate Division, petitioner simply argued, without elaboration, that his conviction should have been reversed on the ground that there was "7. No counsel at time of lineup." At p. 11, Point IV. This cursory argument could hardly have placed the appellate tribunal on notice of any claim by petitioner that the lineup was "so unnecessarily suggestive and conducive to irreparable mistaken identification that

he was denied due process of law." Stovall v. Denno, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); Foster v. California, 394 U.S. 440, 442, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

3. *See* Picard v. Connor, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

4. *Compare* United States v. Fincke, 437 F.2d 856, 858 (2d Cir. 1971), cert. denied, 402 U.S. 995, 91 S.Ct. 2170, 29 L.Ed.2d 160 (1971).

### III. Co-defendant Cox's Confession

■ Petitioner next contends that the admission into evidence of Cox's confession at the joint trial violated petitioner's constitutional rights. The challenge is made on two grounds. First, petitioner claims that since the confession arguably implicated him in the crime, its introduction at the trial violated the rule of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968). However, in those cases appellants, who were implicated by the extrajudicial confessions of their codefendants, had no opportunity to cross-examine these codefendants at trial and were thus denied their Sixth and Fourteenth Amendment rights. Here, in contrast, Cox did testify at the joint trial and was cross-examined by petitioner's counsel. Cox admitted making the statement, but denied its truthfulness, and otherwise testified favorably to petitioner. Trial Record, Vol. X, at 72–79, 141–43, 153–

155. Consequently, petitioner has no viable Bruton claim. See Nelson v. O'Neil, 402 U.S. 622, 628–630, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971). Cf. California v. Green, 399 U.S. 149, 159–164, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). In any event, if error there were, it would be harmless beyond a reasonable doubt for the reason stated below. See Harrington v. California, 395 U.S. 250, 252–253, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

■ Second, petitioner claims that the trial judge's failure to make a preliminary determination, outside the hearing of the jury, of the voluntariness of Cox's confession transgressed the rule of Jackson v. Denno, 378 U.S. 368, 377, 391, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and, therefore, rendered the confession inadmissible at trial.[5] Assuming arguendo that petitioner has standing to raise this issue,[6] and has not waived it by failing to move for a Huntley hearing at or before trial,[7] this court rejects

---

5. A related claim by petitioner as to certain of his own exculpatory statements which were introduced at trial is not cognizable here. Petitioner neither objected during the trial to the introduction of this evidence, nor did he allege on appeal any facts to indicate that the statements were coerced. Title 28 U.S.C. § 2254(b) bars consideration of the claim.

6. Respondent contends that "it is highly doubtful that a defendant has a right to challenge the voluntariness of the confession of a co-defendant, when the codefendant apparently is content not to challenge the confession." Affidavit in Opposition, at 10. In fact, Cox's attorney did object to its admission. Trial Record, Vol. VII, at 15–17. It is also clear that a defendant can, in appropriate circumstances, have his conviction reversed where the improperly obtained confession of a co-defendant has contributed to his conviction. See Jones v. United States, 119 U.S.App.D.C. 284, 342 F.2d 863, 866–867 (1964) (In Banc); cf. Malinski v. New York, 324 U.S. 401, 411–412, 65 S.Ct. 781, 89 L.Ed. 1029 (1945).

7. The pre-1971 Huntley hearing procedure is set out in N.Y.Code of Cr.Proc. §

813–h (McKinney's 1958) (repealed 1971). It is questionable that petitioner's failure to move for the hearing constituted a deliberate bypass of state procedures. Determination of the issue would necessitate a complicated hearing in this court and, even if a waiver were found, the court would still have discretion to grant the relief sought. Fay v. Noia, 372 U.S. 391, 438–439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); See Henry v. Mississippi, 392 U.S. 931, 88 S.Ct. 2276, 20 L.Ed.2d 1389 (1968). The issue is confused by the fact that petitioner's counsel apparently had no knowledge of the contents of Cox's confession prior to its introduction into evidence. Trial Record, Vol. VI, at 144–45. Moreover, the statute, which became effective only months before the trial, might well have been interpreted by counsel as not affording petitioner the right to a Huntley hearing on the voluntariness of a codefendant's confession. N.Y.Code of Cr. Proc., supra, at § 813–g. Finally, contrary to respondent's assertions, the trial record is far from clear as to waiver of the Huntley hearing by Cox's attorney at trial. Vol. VI, at 157–58; Vol. X, at 152–55. Consequently, petitioner's counsel may have viewed the enigmatic course of argument of his co-counsel as

the claim on the ground that, in any event, the alleged error of the trial court was harmless beyond a reasonable doubt. *See* Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The only part of Cox's confession which inculpated petitioner was its reference to "the stout fellow [who] told the people in the store to stick em up." (sic) Trial Record, Vol. VII, at 19. At worst, this statement was merely cumulative evidence supplementing other overwhelming evidence on the issue of petitioner's identity. Petitioner was captured immediately following the robbery in clothing matching the description of that worn by one of the robbers. In addition, he was identified by four eyewitnesses at trial. Thus, there is not the slightest possibility that the description of one of the robbers as a "stout fellow" affected the jury's determination on the identity issue. Compare *Harrington, supra,* where the Supreme Court found the alleged error harmless beyond a reasonable doubt, although the challenged statements were more incriminatory and the evidence against the defendant less conclusive than in the instant case. (*See* p. 1001 *infra*)

IV. *The District Attorney's Summation*

Petitioner finally argues that the state prosecutor employed improper and prejudicial argument in his summation, thereby depriving petitioner of a fair trial within the meaning of the due process clause of the Fourteenth Amendment. Petitioner cites no less than eighteen different remarks in the summation to support this contention. [Plaintiff's Memorandum of Law, at 6–8.]

■ Respondent urges the court to dismiss this claim on the ground that it does not raise a federal question. While some decisions in this Circuit have held particular statements by state prosecutors to be trial errors without constitutional dimensions, *see, e.g.,* United States ex rel. Garcia v. Follette, 417 F. 2d 709, 713 (2d Cir. 1969); United States ex rel. Colon v. Follette, 366 F.2d 775 (2d Cir. 1966); United States ex rel. Castillo v. Fay, 350 F.2d 400, 401 (2d Cir. 1965), cert. denied, 382 U.S. 1019, 86 S.Ct. 637, 15 L.Ed.2d 533 (1966), the court reads the latter decision as propounding a rule of fundamental fairness for testing whether such errors in a specific case violate the Fourteenth Amendment. *See Castillo, supra,* 350 F.2d at 401, 403, 405 (Hays, J., for the Court; Kaufman, J. concurring, Marshall, J. [now Justice Marshall], dissenting on other grounds). Consequently, petitioner's claim is properly before this court.[8]

■ Respondent further argues that petitioner failed to challenge many of the allegedly prejudicial remarks on his state appeal. Therefore, it is argued, petitioner has not met the exhaustion requirement of 28 U.S.C. § 2254(b) in respect to those remarks. However, while not specifically citing all conceivably prejudicial remarks, petitioner's appellate brief did point to no less than fourteen pages of the prosecutor's summation and clearly invited the appellate court to consider the summa-

preserving petitioner's rights. Under the circumstances and in light of the court's disposition of the claim, it is appropriate not to reach the waiver issue. *See* United States ex rel. Jiggetts v. Follette, 446 F.2d 114, 117 (2d Cir. 1971); United States ex rel. Moore v. Follette, 425 F.2d 925, 926–27 (2d Cir. 1970) cert. denied, 398 U.S. 966, 90 S.Ct. 2180, 26 L.Ed.2d 550 (1970).

8. *See* Downie v. Burke, 408 F.2d 343, 344 (7th Cir. 1969), cert. denied, 395 U.S. 940, 89 S.Ct. 2011, 23 L.Ed.2d 457 (1969); Pike v. Dickson, 323 F.2d 856, 858–861 (9th Cir. 1963), cert. denied, 377 U.S. 908, 84 S.Ct. 1164, 12 L.Ed.2d 179 (1964); United States ex rel. Feldt v. Follette, 298 F.Supp. 1298, 1300 (S. D.N.Y.1969) (Weinfeld opinion). *Cf.* United States ex rel. Miller v. Follette, 397 F.2d 363, 364 (2d Cir. 1968), cert. denied, 393 U.S. 1039, 89 S.Ct. 660, 21 L.Ed.2d 585 (1969).

tion as a whole.[9] Since no new issue of fact or law has been raised in this habeas corpus application, the mere citation of additional pages of the trial transcript in this court does not require remission to the state courts of the very same claim which they have previously considered and decided against petitioner.[10] The claim was fairly presented to the state courts and is cognizable here.[11] *See* Picard v. Connor, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

In reaching the merits of petitioner's claim, the court will first consider the challenged remarks of the prosecutor which make no reference to race. They are reprinted in the Appendix to this opinion, *infra*. Taken as a whole, these remarks cannot be said to have so prejudiced petitioner as to have denied him a fair trial.

■ Several of the statements complained of referred solely to co-defendant Cox and could not have affected pe-

titioner's case. [Appendix, #3–5.] The alleged misstatements of testimony and the District Attorney's allusion to an extrajudicial identification by one of the prosecution witnesses were not so offensive as to constitute constitutional error, especially since they were immediately followed by curative warnings by the trial judge. [Appendix, #12–14.] Likewise, the prosecutor's exhortation to the jury to convict the defendants and his alleged appeals to fear, although clearly inappropriate, did not vitiate the fairness of the trial.[12] [Appendix, #10–11.]

■ The prosecutor's comments evincing his personal belief that petitioner testified falsely at the trial are also challenged.[13] Some of these remarks [Appendix, #6–8] were simply an averment of belief based on the evidence adduced at trial and were, therefore, not wholly improper in the absence of any intimation that they were founded on personal knowledge or matter not in ev-

9. "Point II: The Prosecutor's Remarks upon Summation were Inflamatory (sic) and Highly Prejudicial and Warranted Declaration of a Mistrial." Appellant's Brief, at 8. The brief argued that "no impartial arbitrator could read the summation of the prosecutor . . . and express the opinion that the defendant was accorded 'a fair trial.'" *Id.*, at 9.

10. *Compare* United States ex rel. Gentile v. Mancusi, 426 F.2d 238 (2d Cir. 1970); cert. denied, 400 U.S. 944, 91 S.Ct. 248, 27 L.Ed.2d 249 (1971), *with* United States ex rel. Nelson v. Zelker, 465 F.2d 1121 (2d Cir., 1972).

11. Respondent's additional objection to review of this claim on the ground that there was a deliberate bypass of state procedures is not well taken, since the claim was argued on appeal without any mention of the waiver issue. See Respondent's Brief in the Appellate Division, at 5–6. *Cf.* People v. Adams, 21 N.Y.2d 397, 401–402, 288 N.Y.S.2d 225, 227–228, 235 N.E.2d 214 (1968). *See also* the reference to Fay v. Noia in fn. 7, *supra*. United States ex rel. Satz v. Mancusi, 414 F.2d 90 (2d Cir. 1969), cited by respondent, denied relief partly because of defense counsel's failure to object. However, in *Satz*, the prosecutor's remark was "most oblique" (at 92) and

the judge gave curative instructions. In contrast, the racial comments, discussed *infra*, were not at all ambiguous and should have been rebuked by the trial judge on his own initiative.

12. *Compare* United States v. Lamerson, 457 F.2d 371, 372 (5th Cir. 1972); United States v. Grunberger, 431 F.2d 1062, 1068 (2d Cir. 1970); and United States v. Schartner, 426 F.2d 470, 478–479 (3rd Cir. 1970) with United States v. Hysohion, 439 F.2d 274, 277–278 (2d Cir. 1971) and United States v. Sawyer, 347 F.2d 372, 373 (4th Cir. 1965). *See also* United States v. Ramos, 268 F.2d 878–880 (2d Cir. 1959); United States v. Stead, 422 F.2d 183, 184 (8th Cir. 1970), cert. denied, 397 U.S. 1080, 90 S.Ct. 1534, 25 L.Ed.2d 816; 398 U.S. 966, 90 S.Ct. 2181, 26 L.Ed.2d 551 (1970); United States v. Shirley, 435 F.2d 1076, 1079 (7th Cir. 1970).

13. Petitioner also cites a comment by the prosecutor asserting the credibility of one of the state's witnesses. Appendix, #9. The claim of error is rejected under the rationale of Lawn v. United States, 355 U.S. 339, 359 n. 15, 78 S.Ct. 311, 2 L.Ed. 2d 321 (1958). *See also* United States v. Crisp, 435 F.2d 354, 361 (7th Cir. 1970), cert. denied, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971).

idence. *See* Lawn v. United States, 355 U.S. 339, 359 n. 15, 78 S.Ct. 311, 2 L. Ed.2d 321 (1958); United States v. Grunberger, 431 F.2d 1062, 1068 (2d Cir. 1970).[14]

Two other comments on petitioner's credibility, however, were objectionable. The District Attorney stated that:

A lot of things are put in statements by these defendants and they are not there to tell the truth in most cases. You are lucky to get a scintilla of truth out of them. [Appendix, #2]

Now, one of the things that Haynes did was to fabricate a story that would get him in the position that he was found. [Trial Record, Vol. X, at 77]

 Taken together, these remarks constituted "a statement of belief that the jury was expected to understand came from the prosecutor's personal knowledge of, and from the prosecutor's prior experience with, other defendants, and as such he was speaking as an expert based upon matter outside the record. That the remark was improper is beyond dispute." *See* United States v. Grunberger, 431 F.2d 1062, 1068 (2d Cir.1970), and cases cited therein.[15] *Cf.* United States v. Lamerson, 457 F.2d 371, 372 (5th Cir.1972). The prosecutor's apparent scorn for petitioner and for his testimony was aggravated by his reference in the summation to defendants as "these thugs."[16] [Appendix, #1]

The combination of this indecorous characterization of petitioner and the improper disparagement of his testimony might have constituted reversible error, had petitioner's trial occurred in the federal courts. *See* Hall v. United States, 419 F.2d 582, 587 (5th Cir.1969). However, in reviewing petitioner's state court conviction, this court cannot say that the remarks, despite their impropriety, violated petitioner's Fourteenth Amendment rights. Viewing the trial record as a whole, the prejudicial non-racial comments did not create, as a demonstrable reality, such essential unfairness at petitioner's trial that his conviction must be reversed on federal constitutional grounds. *See* Buchalter v. New York, 319 U.S. 427, 431, 63 S.Ct. 1129, 87 L.Ed. 1492 (1942); United States ex rel. Castillo v. Fay, *supra*, 350 F.2d at 401.

On the other hand, the remarks which berated Haynes must also be considered in relation to several derogatory comments by the prosecutor directed at the "colored race." In Part V of this opinion, the court holds that the racial comments in the prosecutor's summation deprived petitioner of a fundamentally fair trial. It is only to be noted at this juncture, that the District Attorney's ostensibly non-racial observations which deprecated petitioner's character and credibility may well have produced racially prejudicial overtones in the minds of the jurors.[17] Juxtaposed against statements to the effect that blacks are different, a comment that "these defendants . . . are not there to tell the truth in most cases" might well be heard as "blacks are liars" and the image of seeing "your mother abused in the background by one of these thugs" might well trigger the most insidious of racial reflexes. [Appendix, #1–2]

14. *See also* Davison v. United States, 368 F.2d 505, 507–508 (9th Cir. 1966); Isaacs v. United States, 301 F.2d 706, 737 n. 37 (8th Cir. 1962) (defendant referred to as "pathological liar").

15. The *Grunberger* court also made clear that the failure to object to like remarks does not necessarily constitute a waiver of the point. At 1068–1069. Although *Grunberger* involved a trial in the federal courts, the court's analysis would appear to apply to state trials as well.

16. The prosecutor also referred to co-defendant Cox as "this vicious little hoodlum." Appendix, #4.

17. Apparently, petitioner was convicted by an all-white jury. Letter of October 15, 1971 from Benjamin Gold, counsel for petitioner at the state trial, incorporated in affidavit of petitioner's counsel here.

## V. Racial Remarks in the District Attorney's Summation

 Petitioner's primary attack on his conviction is directed at the overt racial references which punctuated the prosecutor's argument to the jury. Two of the challenged remarks related solely to the identification issue. They were clearly relevant and responsive to arguments by petitioner's counsel and were not improper.[18] However, there were other remarks by the prosecutor which expressed racial prejudice against petitioner's race.[19]

The prejudicial racial comments cited by petitioner were as follows:

A. . . . I know that [petitioner's counsel] Mr. Gold, in his experience, he has dealt with people for many years of the colored race. *There is something about it, if you have dealt with colored people and have been living with them and see them you begin to be able to discern their mannerisms and appearances and to discern the different shades and so on. Any of you that have never been exposed to them* would never be able to. I don't see, I have been exposed to some degree, that isn't what I am getting at. What I am getting at is those who are living with *them,* dealing with *them,* and working with *them* in a sense, have a much better opportunity to evaluate what they see to identify what they see. [Trial Record, Vol. X, at 27–28]

B. Now, counsel for the defendants told you, and Attorney Gold is probably as well versed with the colored race as any man I know in the legal profession. *He knows their weaknesses and inability to do certain things that maybe are commonplace for the ordinary person to do or remember or know certain things.* [Trial Record, Vol. X, at 38]

C. . . . Here she is, a young girl about 13 [referring to a prosecution witness who was black]. And I know that you have recalled this young McCray girl who is the tall sister of Jones. That young lady [also black] had her first baby at 15. She is now married at 16 with another baby on the way. The maturity among *these people* becomes quite evident quite quickly. Here is a young girl interested in all the young—or ought to be, in the young men of her circle of friends or environment. . . . [Trial Record, Vol. X, at 40–41.]

D. It gets confusing when you talk to some of *these youngsters* like that because they don't express themselves as clearly as you and I might possibly be able to do so. [Trial Record, Vol. X, at 41–42].

E. Eyvonne Martin true enough is 13 years old. Again I point to the fact she is a colored girl. *She knows her own. She knows the young bucks\* in that neighborhood and she knew Terry Cox* [petitioner's co-defendant] [Trial Record, Vol. X, at 43–44].

F. I know that it is the custom and the habit of many colored people to try and straighten their hair.

---

18. The remarks are reproduced in the Appendix, #15–16.

19. Respondent seeks to justify the remarks as 1) "necessary in the light of petitioner's defense" and 2) an effort "to blunt petitioner's appeal to prejudice." The first contention has no merit. *See* United States ex rel. Castillo v. Fay, 350 F.2d 400, 401 (2d Cir. 1965), cert. denied, 382 U.S. 1019, 86 S.Ct. 637, 15 L.Ed. 2d 533 (1966) ; p. 1004 and note 24 *infra.* As for the second purported justification, the court fails to see how the prosecutor's racial remarks could have ameliorated defense counsel's appeals to prejudice, if any were made, nor indeed how respondent can even compare the comments made by the prosecutor with those of petitioner's trial counsel.

\* "A male Indian or Negro—often used disparagingly." Webster's Third International Dictionary, at 288.

I don't know what the reason for it is. But in any event it is not uncommon to observe colored people with a heavy pomade grease or hair dressing in their hair. It is also not uncommon to find colored people with somewhat exotic hairdos, male and female. Most of the exotic hair-dos take the form of a skull cap type hair-do, plastered down. You may have seen this. Others are taking the trend of the current day, of the long hair. It seems to be a fad. May I say that I cannot participate in that. The tendency on the part of these faddists, if I can call them that, is that they use this black bandana type, you have seen it, to hold the hair down. The effect of this grease is to straighten that hair out. And that would bring the hair down. The long hair as described by Mrs. Balon, being pulled down, plastered down on the side of the head and by Investigator Demler, who described it as long. This is not the type of sideburns that *we* usually think of when *we* think of sideburns. It probably operates much as bangs operate on a lady. They do not grow out of your forehead. They come off the top and dress down . . . . [Trial Record, Vol. X, at 79–81] (Emphasis added.)

Petitioner's constitutional claims regarding these remarks are: 1) these overt racial references crossed the line of fair comment and conduct and constituted an invitation to the jury to base its verdict not on the evidence in the case but on the petitioner's race, and 2) the trial judge—by countenancing the conduct of the prosecuting attorney—effectively communicated his own hostility toward the defendants to the jury. (Petitioner's Brief, pp. 8–9). In short, says petitioner, the actions of the prosecuting attorney—not interfered with by the court—were totally inconsistent with the fair and impartial jury trial which is petitioner's right under the Fourteenth Amendment.

■ The court holds that such prosecutorial argument, in the presence of a jury, is a trial error of constitutional magnitude. Indeed, where a prosecutor maligns a defendant's race before the jury, the very integrity of the trial process is destroyed and the trial becomes little more than a mockery of justice. Consequently, this court holds that the prosecutor's overt racial remarks, set forth above, denied petitioner a fundamentally fair trial in violation of rights secured to him by the due process and equal protection clauses of the Fourteenth Amendment to the Federal Constitution.[20]

More specifically, the court holds that the prosecutor's remarks introduced race prejudice into petitioner's trial thereby denying petitioner his due process right to an unbiased tribunal. In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *see* Peters v. Kiff, 407 U.S. 493, 501–502, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (Opinion of Marshall, J.), and his right to "stand on an equality before the bar of justice in every American court." Griffin v. Illinois, 351 U.S. 12, 17, 76 S.Ct. 585, 590, 100 L.Ed. 891 (Opinion of Black, J.), reh. denied, 351 U.S. 958, 76 S.Ct. 844, 100 L.Ed. 1480 (1956), *quoting* Chambers v. Florida, 309 U.S. 227, 241, 60 S.Ct. 472, 84 L.Ed. 716 (1940). *See* Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L. Ed.2d 536 (1972) (exclusion of Negroes from grand jury which indicted Negro

---

20. Since petitioner's trial occurred prior to the Supreme Court decision in Duncan v. Louisiana, 391 U.S. 145, 194, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the Sixth Amendment right to jury trial is not in question here, but rather the Fourteenth Amendment requirements of due process and equal protection. *See* Peters v. Kiff, 407 U.S. 493, 496, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (Opinion of Marshall, J.); De Stefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968).

defendant); Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953) (exclusion of Negroes from petit jury); Hamilton v. Alabama, 376 U.S. 650, 84 S.Ct. 982, 11 L.Ed.2d 979 (1964) (discrimination by state attorney in addressing Negro witnesses); Johnson v. Virginia, 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed. 2d 195 (1963) (courthouse segregation).

To preface the court's elaboration of this holding, a decision of the Appellate Division, Supreme Court, New York County, is worthy of consideration. In People v. Hearns,[21] a unanimous court stated:

. . . The crucial issue in the case . . . was whether the admissions were coerced or voluntary. With respect to this issue the prosecutor, in his summation, stressed that two of the principal witnesses, namely, a police officer and a correction officer, had testified against the defendant *despite the fact that such officers were of the same color or race as the defendant.*

The defendant's objection to such reference to race and color was overruled. In our opinion such a plea to the jury, based on color and race, no matter how artfully phrased, constitutes an appeal to prejudice and passion; it violates every basic concept of fair trial; and it vitiates the resulting judgment of conviction [citing cases].

The vice of such an argument is not only that it is predicated on a false and illogical premise, but more important it is divisive: it seeks to separate the racial origin of witnesses in the minds of the jury, and to encourage the weighing of testimony on the basis of the racial similarity or dissimilarity of witnesses. The argu-

ment offends the democratic and logical principle that race, creed or nationality, in themselves, provide no reason for believing or disbelieving a witness's testimony. Hence, any judgment rendered following such offensive argument during summation must be set aside. · [Emphasis in the original]

While the racial references in the *Hearns* case were similar to the District Attorney's remarks A-E, above, in that they were intended to bolster the testimony of a witness on account of his or her race,[22] the remarks involved here were considerably more offensive because they were also 1) derogatory of colored people and 2) divisive. The derogatory tenor of the remarks is beyond dispute. The overall effect of the prosecutor's unnecessary comments was to hold colored people up to ridicule and contempt. What is worse, however, is that the prosecutor's argument invited the jurors to view colored people as a whole and the defendants in particular as members of a group which is not really a part of the same community as the jurors'. The we-they, you-they, white-black dichotomy is prominent in all of the comments reproduced above as well as in other parts of the prosecutor's summation.[23] [See, e.g., Trial Record, Vol. X, at 29, 30, 35.] The net psychological effect was to divide the courtroom along racial lines, the white jury on one side sitting in judgment of the black community and these black defendants on the other side. Thus, the prosecutor's argument denied petitioner his right to an unbiased tribunal of which the prosecutor was an integral part and his right to stand equal before the law.

■ "A fair trial in a fair tribunal is a basic requirement of due process."

---

21. 18 A.D.2d 922, 923, 238 N.Y.S.2d 173, 174–175 (2d Dept.1963).

22. *See also* People v. Bain, 5 Cal.3d 839, 97 Cal.Rptr. 684, 489 P.2d 564, 570 (1971) (black prosecutor's expression of personal belief in black defendant's guilt based on racial foundation, held reversible error).

23. *Compare* Brent v. White, 276 F.Supp. 386, 389 (E.D.La.1967), aff'd, 398 F.2d 503 (5th Cir. 1968), cert. denied, 393 U.S. 1123, 89 S.Ct. 998, 22 L.Ed.2d 130 (1969), where the mere reference to the victim of the crime as "a white girl" was held not inflammatory. See note 17 *supra.*

In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). Trial proceedings must be conducted with integrity and dignity so as to avoid "every procedure which would offer a *possible* temptation to the average man . . . to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused. . . . [Tumey v. Ohio, 273 U.S. 510, at 532, 47 S.Ct. 437, 71 L.Ed. 749 (1927)]." Estes v. Texas, 381 U.S. 532, 543, 561, 85 S.Ct. 1628, 1633, 14 L.Ed.2d 543, reh. denied, 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d 118 (1965). (Emphasis in the original.) The prosecutor here debased the court proceedings with racial slurs. "The government attorney in a criminal prosecution is not an ordinary party to a controversy, but a 'servant of the law' with a 'twofold aim . . . that guilt shall not escape or innocence suffer.'" Singer v. United States, 380 U.S. 24, 37, 85 S.Ct. 783, 791, 13 L.Ed.2d 630 (1965), *quoting* Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).[24] By expressing his racial bias to the jury, the prosecutor did not meet this responsibility, but, contrariwise, stripped petitioner of the equality before the law which it was the obligation of the state and its judiciary to protect.

A second element of a fair tribunal is that the trial jury be composed of "a panel of impartial, 'indifferent' jurors."

Irvin v. Dowd, 366 U.S. 717, 722–724, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). This due process requirement was also undermined by the District Attorney's arguments to the jury. It would make no sense whatsoever to insist unequivocally that jurors enter the courtroom in an impartial and indifferent frame of mind,[25] only then to allow them to be subjected to racial appeals which destroy their unimpassioned judgment. Just as the processes of the courts must be insulated from prejudicial interferences so as to assure impartiality,[26] they must even more clearly be protected from an atmosphere of racial prejudice in the court room.

■■■ Furthermore, it is axiomatic that a fair trial must provide for a fair hearing of a defendant's witnesses. *See* Washington v. Texas, 388 U.S. 14, 87 S. Ct. 1920, 18 L.Ed.2d 1019 (1967); In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948). Where racial bias is expressed in a prosecuting attorney's arguments to the jury, as was the case here, it is conceivable that the jury will discount the testimony of all black witnesses at the trial. Although, by some incomprehensible logic, the prosecutor made several of the remarks in the course of rehabilitating his own black witness, they might still have had this effect. The prejudicial impact on petitioner's case is incalculable, since his defense depended entirely on his own testimony and that of his wife and other blacks.[27]

---

24. *See* Viereck v. United States, 318 U.S. 236, 247–248, 63 S.Ct. 561, 87 L.Ed. 734 (1943); United States v. Grey, 422 F.2d 1043, 1045–1046 (6th Cir. 1970), cert. denied, United States v. Williams, 400 U.S. 967, 91 S.Ct. 380, 27 L.Ed.2d 387 (1970); United States v. Hayward, 136 U.S.App.D.C. 300, 420 F.2d 142, 147 (1969); Hall v. United States, 419 F.2d 582, 583, 587–588 (5th Cir. 1969); People v. Steinhardt, 9 N.Y.2d 267, 269–272, 213 N.Y.S.2d 434, 435, 173 N.E.2d 871 (1961).

25. *See* Irvin v. Dowd, *supra*, at 722, 81 S.Ct. 1639. *See also* United States ex rel. Bloeth v. Denno, 313 F.2d 364, 372–373

(2d Cir. In Banc 1963), cert. denied, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963).

26. See Sheppard v. Maxwell, 384 U.S. 333, 362–363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 540–541, 560–562, 85 S.Ct. 1628, 14 L.Ed. 2d 543, reh. denied, 382 U.S. 875, 86 S. Ct. 18, 15 L.Ed.2d 118 (1965); Moore v. Dempsey, 261 U.S. 86, 90–91, 43 S.Ct. 265, 67 L.Ed. 543 (1923).

27. Various white witnesses, including seven police officers and the two victims of the robbery, testified for the state.

**1002**

Finally, in the words of Justice Marshall the Supreme Court "has held that due process is denied by circumstances that create the likelihood or the appearance of bias" in criminal trials. Peters v. Kiff, 407 U.S. 493, 502, 92 S.Ct. 2163, 2168, 33 L.Ed.2d 83 (1972) (Opinion of Marshall, J.) In this regard, the Court's statement in the case of In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), has often been repeated:

> "Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." 349 U.S., at 136, 75 S.Ct., at 625.

*See, e. g.,* Peters v. Kiff, supra, 407 U.S. at 502, 92 S.Ct. 2163; Sheppard v. Maxwell, 384 U.S. 333, 352, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). At petitioner's trial, the prosecutor's summation dealt with the jury as a racial group distinct from that of the defendants and maligned the defendant's race. The cumulative effect of the argument created "such a probability that prejudice will result that it [the verdict] is deemed inherently lacking in due process." United States ex rel. Owen v. McMann, 435 F.2d 813, 818 (2d Cir. 1970), cert. denied, 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971). (Brackets, in the original.) [28]

In addition to violating petitioner's right to due process at his trial, the prosecutor's closing argument infringed the injunction of the Fourteenth Amendment that all persons be afforded the equal protection of the laws. Of course, the guarantees of equal protection and due process are inevitably intertwined in the basic conception of a fair trial. *Cf.* Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Chambers v. Florida, 309 U.S. 227, 241, 60 S.Ct. 472, 84 L.Ed. 716 (1940). Thus, the due process infirmities at petitioner's trial resulting from the prosecutor's racial remarks, as set forth above, may equally be viewed as grounds for finding a denial of equal protection. However, there are additional grounds for holding that the prosecutor's conduct violated petitioner's right to equality before the law.

In a long line of cases, the Supreme Court has emphasized that a state and its agents cannot discriminate against any person in its criminal statutes or procedures on account of that person's race or color. Alexander v. Louisiana, *supra;* Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967); McLaughlin v. Florida, 379 U.S. 184, 85 S. Ct. 283, 13 L.Ed.2d 222 (1964); Hamilton v. Alabama, *supra;* Johnson v. Virginia, *supra;* Avery v. Georgia, *supra;* Hollins v. Oklahoma, 295 U.S. 394, 55 S. Ct. 784, 79 L.Ed. 1500 (1935); Martin v. Texas, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497 (1906); Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676 (1879) (state judge convicted of federal crime of excluding Negroes from state grand and petit juries); Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1879) (defendant has right to trial by a jury selected and impaneled without discrimination against his race or color).[29]

---

28. Of course, without questioning the jurors themselves, it is impossible to be certain that the prosecutor's remarks actually did obstruct the fair and deliberate consideration of petitioner's case. Thus, the court must deal in probabilities. *See, e. g.,* Harrington, *supra,* 395 U.S. at 254, 89 S.Ct. 1726, 23 L.Ed.2d 284; Irvin v. Dowd, *supra,* 366 U.S. at 724–725, 81 S.Ct. 1639. As the Court of Appeals of this circuit stated in *Owen supra,* there is no "litmus paper test" for making a determination of the probability of prejudice. 435 F.2d, at 818

(consideration by jury of extra-record statements by some jurors about the defendant, held violative of due process because of probability of prejudice.)

29. In *Strauder,* the Court stated:
"The words of the [Fourteenth] Amendment . . . contain a necessary implication of a positive immunity, or right, most valuable to the colored race —the right to exemption from unfriendly legislation against them distinctively as colored; exemption from legal discriminations, implying inferiority in civ-

For one thing, it is a settled rule that a defendant's constitutional rights are violated by a state's purposeful or deliberate denial to members of his race of participation as jurors at his trial.[30] The rule implies that it is equally unconstitutional for the prosecutor, as representative of the state, to exploit the racial composition of a validly constituted all-white jury in arguing the state's case against a black defendant.[31] Such exploitation of race in a criminal trial is as offensive to constitutional principles as the enforced segregation of races in the courtroom, Johnson v. Virginia, *supra*, or a contempt order imposed upon a black witness for failure to respond to a prosecutor's questions, where the witness refused to answer on the ground that she was not addressed properly by the prosecutor on account of her race. Hamilton v. Alabama, *supra*.[32]

The prosecutor's summation deprived petitioner of equal protection at his trial in two other respects. On the one hand, the prosecutor's gratuitous racial comments detracted from the solemnity and significance of the trial by demeaning the race of defendants. In effect, the jury was indirectly told that petitioner's value as a person was less than that of a white person. What would it really matter if he were deprived of his liberty?

On the other hand, the we-they terminology, employed by the state prosecutor, impressed on the jurors the notion that petitioner, as a black, was somehow an outsider in their community. This may well have reduced the jurors' concern for the consequences of a guilty verdict.[33]

In short, petitioner was manifestly entitled to a trial no different from that which a white person in his position would have received, a trial free from offensive and prejudicial remarks directed at his race. The prosecutor's argument deprived petitioner of this right.

The court concludes that petitioner was denied his federally guaranteed rights to due process and equal protection and, consequently, his right to a fundamentally fair trial.

---

il society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race." 100 U.S., at 307–308.

30. *See* the cases cited in Peters v. Kiff, *supra*, 407 U.S., at 497 n. 6 & n. 8, 92 S. Ct. 2163, 33 L.Ed.2d 83.

31. Whether the policy underlying the rule reflects concern that a defendant be tried by his community, *see* Williams v. Florida, 399 U.S. 78, 87, 100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) ; Baldwin v. New York, 399 U.S. 66, 72, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970) ; Duncan v. Louisiana, 391 U.S. 145, 156, 194, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the assurance of impartiality, *see* Irvin v. Dowd, *supra*, 366 U.S. at 722–724, 81 S.Ct. 1639, 6 L.Ed.2d 751, or simply a condemnation of government discrimination in any form, *see* p. 1002, *supra*, the policy is offended by such prosecutorial conduct.

32. In a sense, conduct of this nature is a relic of slavery. *See* Bell v. Maryland, 378 U.S. 226, 248 n. 4, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964) (Opinion of Douglas, J.)

33. Jurors can and do exercise their virtually unfettered power to protect defendants from what the jurors expect may be too harsh punishment under the law. *See* Kalven and Zeisel, The American Jury, 306–312 (1966). Thus, even if it were clear that the jurors were fair in finding the facts of the case, they may not have been as "fair" as they might otherwise have been in exercising their moral judgment. *See Owen, supra*, p. 1002, 435 F.2d at 817–818; United States v. Dougherty, 41 U.S.L.W. 2054, 2055 (D.C. Cir., June 30, 1972) ; United States v. Spock, 416 F.2d 165, 182 (1st Cir. 1969). As the Court of Appeals in this Circuit has noted, " . . . the jury has 'power to bring in a verdict in the teeth of both law and facts,' Horning v. District of Columbia. 254 U.S. 135, 138, 41 S.Ct. 53, 65 L.Ed. 185 (1920). . . ." United States v. Marchese, 438 F.2d 452, 455 (2d Cir. 1971), cert. denied, 402 U.S. 1012, 91 S.Ct. 2188, 29 L.Ed.2d 435 (1971).

## VI. *The Issue of Harmless Error*

Respondent would have the court determine that, "even if . . . any error in the summation rose to constitutional proportions, the overwhelming evidence against petitioner makes this error harmless [beyond a reasonable doubt]", citing *Harrington* and *Chapman, supra.* However, as the opinion makes abundantly clear, this court does not think that petitioner's state prosecution comported with "the fundamental conception of a fair trial." Estes v. Texas, *supra,* 381 U.S. at 560, 85 S.Ct. at 1641, 14 L.Ed.2d 543 (Warren, C. J., concurring). Consequently, under this view of the case, there can be no question of whether or not the constitutional error contributed to petitioner's conviction, for the error was so significant as to make the trial a nullity.[34]

■ Therefore, the court holds that when a prosecuting attorney makes prejudicial remarks to a jury concerning a defendant's race, creed or color, the constitutional error which results destroys the fundamental fairness of the proceedings and can never be considered harmless beyond a reasonable doubt.

Assuming, nonetheless, that the harmless constitutional error rule does apply to the issue presented here, the court would reach the same result. After evaluating the entire record of petitioner's trial, the court cannot conclude that the constitutional error committed by the state prosecutor was harmless beyond a reasonable doubt and might not have contributed to petitioner's conviction. The reasons for this conclusion follow.

First, a comparison with the *Chapman* decision is instructive. As Justice Harlan pointed out in his dissenting opinion, the evidence against Chapman adduced at trial was virtually conclusive and Chapman offered no defense on the merits. *See* 386 U.S., at 54–55, 87 S.Ct. 824, 17 L.Ed.2d 705. Moreover, Chapman's prosecution for kidnapping and murder, for which she was sentenced to life imprisonment, was far more serious than petitioner's alleged crime. Finally, the constitutional error in *Chapman* was the extensive argument by the prosecutor directed at Chapman's failure to take the stand. In comparing the records, the error in *Chapman* can certainly not be viewed as any more damaging than the error committed at petitioner's trial and, as in *Chapman,* this court cannot conclude that the error was harmless beyond a reasonable doubt.

Second, consideration of the other major Supreme Court precedents on this issue, *Harrington, supra,* Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) and Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), confirms this conclusion. *Harrington* and *Schneble* involved the use at trial of the confessions of codefendants, without the opportunity for cross-examination, in violation of the *Bruton* rule. In *Milton,* the petitioner challenged the introduction into evidence of statements which he had made to a police officer under circumstances which, the petitioner contended, violated his constitutional rights. In all three cases, the Supreme Court held that the alleged constitutional error was harmless beyond a reasonable doubt.

In each of those cases, however, the prejudice resulting from the alleged error was exclusively evidentiary in nature. In *Harrington,* the confessions of

34. This is undoubtedly what the Supreme Court meant when it stated in *Chapman* that "some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error." 386 U.S., at 23, 87 S.Ct., at 827–828. The error here can hardly be considered "so unimportant and insignificant that [it] may, consistent with the Federal Constitution, be deemed harmless." *Id.,* at 22, 87 S.Ct., at 827. *See also* Parker v. Gladden, 385 U.S. 363, 365, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); Sheppard v. Maxwell, 384 U.S. 333, 352, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 543–544, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); United States v. Hayward, 136 U.S.App.D.C. 300, 420 F.2d 142, 144–145 (1969).

two codefendants who did not take the stand corroborated Harrington's presence at the scene of the crime. However, "Harrington himself agreed he was there." 395 U.S., at 253, 89 S.Ct., at 1728, 23 L.Ed.2d 284. *See Schneble, supra,* 405 U.S., at 430, 92 S.Ct. 1056. Likewise, the Court in *Schneble* stated that

> the allegedly inadmissible statements of Snell at most tended to corroborate certain details of petitioner's comprehensive confession [which was] internally consistent, [was] corroborated by other objective evidence, and [was] not contradicted by any other evidence in the case. 405 U.S., at 431, 92 S.Ct., at 1059.

The challenged evidence in the *Milton* case was also duplicative of other evidence at trial. Indeed, Milton gave "no less than three full confessions," all of which were introduced at trial, prior to making the challenged statements to the police officer. 407 U.S., at 373, 375–376, 92 S.Ct., at 2175.

In each of these cases, the Supreme Court held that there was overwhelming evidence of the defendant's guilt, that the constitutional error simply injected cumulative evidence into the trial, and that, consequently, the error could not, beyond a reasonable doubt, have contributed to the verdict.

Thus, petitioner's case is distinguishable from *Harrington, Schneble,* and *Milton* on both theoretical and factual grounds. On the one hand, the constitutional error at petitioner's trial was not in any way an evidentiary matter. If the only effect of the prosecutor's racial argument had been to strengthen the testimony of the 13-year old black girl,

this court might find the error harmless beyond a reasonable doubt, since it might be argued that the evidence she provided was essentially duplicated by three other witnesses.[35]

However, the error here affected petitioner's trial in a far more significant way by prejudicing the minds of the jury against petitioner's race.[36] This kind of influence is far more likely to contribute to a jury's thought processes and to its eventual verdict than the introduction of improper evidence which merely duplicates other evidence on the same issue. Especially when the discretionary aspect of the jury's role is taken into account, the force of this distinction becomes apparent.[37]

On the other hand, apart from this theoretical framework, the facts of petitioner's case are in stark contrast to the facts in the Supreme Court cases discussed above. Petitioner claimed that he was not at the scene of the crime. Petitioner testified to that effect [38] and parts of his story were corroborated by other witnesses. If the jury had thought his story credible in the least, there is much more than a reasonable doubt that they may have questioned the eyewitness identifications and the circumstantial evidence of guilt, all of which were challenged by the defense. Moreover, even taking the prosecution's case on its own merits, there was some room for doubt that the eyewitness identifications were reliable, since other persons who were near the robber in the store found it impossible to identify petitioner as the guilty party, and the circumstantial evidence of guilt was far from conclusive. Therefore, viewing the record as a whole, the court cannot say,

35. *See* p. 995 *supra.*

36. In *Chapman,* too, the error did not add evidence to the prosecution's case, but prejudiced the jury against the defendant for her failure to testify at the trial. The Court stated: "Petitioners are entitled to a trial free from the pressure of unconstitutional inferences." 386 U.S., at 26, 87 S.Ct., at 829. The same rule applies here.

37. *See* note 33 *supra. See also* The American Jury, *supra,* note 33, at 303, 345–47.

38. Schneble and Chapman did not testify at their trials, 405 U.S., at 427–428, 92 S.Ct. 1056; 386 U.S., at 55, 87 S.Ct. 824; nor apparently did Milton or Hamilton testify at theirs. *Cf.* 395 U.S., at 252, 89 S.Ct. 1726, 23 L.Ed.2d 284.

beyond a reasonable doubt, that the racial bias instilled in the proceedings by the District Attorney did not contribute to petitioner's conviction.[39]

Petitioner has already paid six years of his life to account for the crime that he allegedly committed. If the state determines that continued incarceration of petitioner for his alleged crime is advisable, it has the opportunity to retry petitioner and to find him guilty, if the jury so decides. However, this time it must utilize a trial process which conforms to the constitutional requirements of an unbiased tribunal and respects petitioner's constitutional right to stand equal before the law.

The petition is granted unless the state within 60 days from the date of the entry of this court's order retries petitioner.

Submit Order within 10 days on five days' notice. Dated: New York, New York

### APPENDIX

Reprinted below are the non-racial remarks in the prosecutor's summation which are challenged by petitioner. The page numbers refer to Volume X of the Trial Record. The statements have been reproduced *verbatim* with the exception of #11, where some repetitious phrases have been deleted.

1. Pp. 26–27: "What more could you be expected if you were in Mrs. Balon's waiting on customers and had someone come in and put a gun to the back of your head. To be standing there with a gun to the back of your head and see your mother abused in the background by one of these thugs, what kind of a reaction would you think she would have?"

2. P. 73: "A lot of things are put in statements by these defendants and they are not there to tell the truth in most cases. You are lucky to get a scintilla of truth out of them."

3. P. 67: "Where was he [Cox] between the hour of 20 minutes of 9 and let us say 9:30? We know."

4. P. 71: (about Officer Fuller who took Cox's confession) "He knows as well as I that the rough stuff is out in the investigatory stages of any kind of a case. He knows it doesn't pay. He knows you can't succeed by rough stuff. He knows that there is only one proper way that a statement may be obtained from any witness and that is by fair, open discussion with that witness; trying to point out to him that he should tell the truth; that he should give a statement as to what happens in order to properly eliminate the crime from the books.

 It is his duty to question witnesses. It is his duty to question defendants, persons suspected of committing a crime. And the only thing that they will try to make you believe is that he browbeat this youngster, brainwashed that youngster they call it. This vicious little hoodlum, that is what I call him. Brow-

---

39. The court's conclusion here does not in any way contradict the earlier holding in this opinion that the admission into evidence of Cox's confession was harmless beyond a reasonable doubt. See p. 995, *supra*. Indeed the reference in Cox's confession to "the stout fellow" was a perfect example of cumulative evidence which could not possibly have contributed to the jury's verdict. At this juncture, the court is saying that, with or without that evidence, the only basis for a judgment of acquittal was the testimony of petitioner and of the other defense witnesses, all of whom were black. Their testimony might have created a reasonable doubt as to petitioner's guilt. It was precisely that testimony which may have been undermined by the prosecutor's racial remarks and, therefore, the court cannot say that the error was harmless beyond a reasonable doubt.

beat him so that he would give a statement. And then he gets on the stand and says it was a bold-faced lie from stem to gudgeon. Was it?"

5. P. 72: "Now I am certain that Mr. Fuller did not believe this defendant. . . ."

6. P. 74: "I am not going to waste a great deal of time in talking about Mr. Haynes because first of all I think you are satisfied and you should be, that his story is made up of whole cloth. There is absolutely no validity to the story. It has no ring of truth."

7. P. 75: (about Haynes) "He wasn't able to get Mrs. Travick to come into court and testify as to his being on her front porch, because he never was on her front porch at any time that night. You know that as well as I."

8. P. 77: "And I point out these inconsistencies to you, that it [petitioner's story] was made up out of whole cloth. A person who lies and doesn't tell the truth gets tripped up by their own falsehoods. . . ."

9. P. 50: "She told you blow-by-blow everything that happened and what happened thereafter and what she did about it. I felt she made an excellent, honest witness."

10. Pp. 83–84: "Did these defendants commit this crime? If they did your duty is as it has been mine to see that they are prosecuted and for you to bring in a proper verdict of guilty. It is the duty of you as members of the community to do this. We cannot take these people out of the community unless you twelve people sitting in judgment on these matters decide these things have got to stop. I ask you to find these defendants guilty on all counts of this indictment and you can go home with the clearest conscience that you have ever had."

11. Pp. 19–20: [Talking about being robbed through force and fear.] "I hope it never happens to any of you or to me. . . . Some of the results of some robberies are pretty deadly. This is a crime, a heinous crime . . . . I am going to say it has to be stopped. I don't know who is going to stop it, if I can't bring in cases like this one and have a jury decide this has got to end in our community. It is only in your hands it can be done . . . . it has got to boil down to what kind of straight backs have we got on the jury. Are they going to stand up and take these cases in the light of what is good for society in which we live as well as for these defendants."

12. P. 54: Misstatement of testimony and fact that a police officer knew he was chasing Haynes.

13. P. 76: Misstatement of testimony and fact as to what pockets the money was in.

14. P. 50: [Objection by defense attorney Gold sustained as to manner of identification by Goldie Pressley not being in evidence.].

"Now, she came into this courtroom and at which time there were a number of colored people in the courtroom and as well as these defendants. I told her to look all of the people in the courtroom over also in the hall. She spent a good deal of time doing it. The next break she told me that she could identify two of the men."

15. Pp. 35–36: . . . "I remember in the voir dire questions it

was said that if somebody walked in this room six of you would say he was colored and six would say he was white because there was nothing to call your attention to it. But if you saw two people come in and walk in this courtroom and start a fist fight in front of the judge, you might remember a little more about it because your attention is centered on it."

16. P. 79: "Apparently this defendant Cox has kinky hair. It is discernible when you look at it. It was brought up to you. You were shown how kinky it is."